**Sheldon L. WULF, Plaintiff–Appellee,**

**v.**

**The CITY OF WICHITA, Gene Denton,
and Richard Lamunyon,
Defendants–Appellants.**

**Nos. 87–1725, 87–1735, 87–1750
and 87–2563.**

United States Court of Appeals,
Tenth Circuit.

Aug. 9, 1989.
Rehearing Denied Oct. 31, 1989.

---

* Honorable Stephen V. Wilson, United States District Judge for the Central District of California, sitting by designation.

Robert L. Howard of Foulston, Siefkin, Powers & Eberhardt, (Timothy B. Mustaine of Foulston, Siefkin, Powers & Eberhardt, Gary Rebenstorf and Joe Allen Lang of the Office of the City Atty., with him on the briefs), Wichita, Kan., for defendants-appellants.

Jack Focht of Focht, Hughey, Hund & Calvert, Wichita, Kan. (Karlin Church Lawing, San Francisco, Cal., with him on the brief), for plaintiff-appellee.

William C. Summers of Intern. Ass'n of Chiefs of Police, Inc., Gaithersburg, Md., on the brief amicus curiae of the Intern. Ass'n. of Chiefs of Police, Inc.

John C. Ruckelshaus of Ruckelshaus, Roland, Hasbrook & O'Connor, Indianapolis, Ind., on the brief amicus curiae of Fraternal Order of Police, Grand Lodge.

Before ANDERSON, SETH and BRORBY, Circuit Judges.

STEPHEN H. ANDERSON, Circuit Judge.

Plaintiff Sheldon Wulf commenced this 42 U.S.C. § 1983 action against his former employer, the City of Wichita (the "City"), and against the City Manager and the Chief of Police, alleging that his dismissal from the police force because of a letter he wrote violated his First, Fifth, and Fourteenth Amendment rights. After a trial to the court, Wulf was awarded damages of $702,642.95, allocated as follows: $250,000 for emotional distress, $242,465.95 for back pay, and $210,177.00 for front pay, in lieu of reinstatement. The district court additionally assessed $50,000 in punitive damages against the Chief of Police alone. Wulf's counsel was awarded $272,725.15 in attorneys' fees and $7,676.70 in costs. Defendants appeal, challenging the finding of liability, the amount of damages awarded, and the attorneys' fees.[1] We affirm in part, reverse in part and remand.

## BACKGROUND

Wulf's employment as a police officer with the City began on March 1, 1966, and continued until his termination on April 21, 1981. During that time his personnel record reveals that he was a competent and satisfactory employee. In May 1978, he was promoted to Lieutenant and as such became a supervisory employee. At all times relevant to this appeal, defendant Richard LaMunyon was the Chief of Police and defendant Gene Denton was the City Manager of Wichita.

---

1. Defendants initially filed an appeal which was dismissed for lack of a final order. They subsequently filed this timely appeal.

Wulf joined the Fraternal Order of Police ("FOP") in 1974, and thereafter served as President of the local and state FOP lodges. He was a member of the Executive Board of the state FOP lodge for eight years.

The record in this case amply supports the district court's conclusion that, commencing at least in 1978, "[t]here were problems between the F.O.P. and Chief LaMunyon." *Wulf v. City of Wichita,* 644 F.Supp. 1211, 1214 (D.Kan.1986). In September 1978, there was a one week strike by 163 Wichita policemen which, while not officially sanctioned by the FOP, included some FOP members. Wulf did not participate in the strike. Following the strike, LaMunyon did not rehire 28 policemen who had participated in it.

Relations between LaMunyon and the FOP were further strained by a stag party held in September 1979 at the FOP's private club. Activities at the stag party included the showing of a pornographic movie, nude dancing, and gambling. Various state liquor laws were violated. Wulf did not attend the party nor did he participate in its organization. Reports on the stag party appeared in the local news media. LaMunyon ordered an investigation into the party, fired the local FOP President and Secretary, demanded a public apology by the event's organizers, and asked the local FOP to turn in its private club license, which it ultimately did after an investigation by the Kansas Division of Alcoholic Beverages Control.

Wulf, as well as six other supervisory officers, testified that, in the months following the stag party, they received suggestions from superior officers that they resign from the FOP. Those superior officers in turn denied making such suggestions, although a few did state that they had conversations with Wulf and others concerning a perceived conflict of interest between being a supervisor and belonging to the FOP, but that no one was directed to resign from the FOP.[2] Wulf said that he had conversations with other officers concerning similar suggestions from superiors and at one point spoke on television about them. Wulf recorded these conversations in a notebook.[3] LaMunyon conceded that if there was a rumor "from the brass, that it's not healthy for your career here in the Police Department if you belong to the FOP," it would have a "chilling effect" on FOP membership. R.Vol. V at 210–12. He denied having any interest in dissolving or weakening the FOP and testified that he had a good relationship with the FOP and that he viewed it as an important part of the police department. He also testified that membership in the FOP was never a consideration in promotion decisions. He conceded, however, that he was correctly quoted in a newspaper article appearing on November 22, 1981 as saying "To say the relationship between current FOP leadership and myself is strained is somewhat of an understatement. The fact of the matter is I don't speak to them." R.Vol. XXVI at 92. The district court specifically found that "LaMunyon's testimony on the witness stand that he had a good relationship with the local F.O.P. is not credible and at best reflects his own subjective opinion." *Wulf,* 644 F.Supp. at 1214.

On October 5, 1979, Wulf's attorney wrote a letter to LaMunyon, alleging that "recent well-publicized problems have apparently led high-ranking officers in your Police Department to demand resignations

---

**2.** Captain Floyd Powell's evaluation of Wulf for the year March 4, 1979 through March 4, 1980 expressed a concern about the perceived conflict of interest:

"Lt. Wulf should be aware that dual job relations of WPD supervisor and FOP office holder presents conflicting views, opinions and working relations even though one tries to keep such job descriptions in their seperate [sic] places."

Pl.'s Ex. 1, Appellee's Addendum of Exhibits at 3.

**3.** None of the officers testified as to any direct involvement with or communication from LaMunyon or City Manager Denton concerning FOP membership. Wulf testified that he never heard Denton or LaMunyon or any of LaMunyon's Deputy Chiefs direct anyone to get out of the FOP. Captain Vergil Ternes testified, however, that when Deputy Chief Coffey spoke to him about getting out of the FOP, he "assume[d] that he would be speaking with or advising with some authority." R. Vol. XXX at 726.

from some members of the FOP," and charging that such conduct violated the First Amendment. Plaintiff's Ex. 8, Appellants' Addendum of Exhibits at 1. LaMunyon testified that, after receiving the letter, he "called the staff together, the Deputy Chiefs and the Majors, and asked if anyone was doing it. They said no. And I said if you are, knock it off. You can't do it." R.Vol. V at 89. LaMunyon responded to the letter with his own letter dated October 9, in which he denied ever personally suggesting that anyone resign or refrain from joining the FOP, and indicated that he had directed his staff to make no such suggestions.

In August of 1980, Wulf was transferred laterally to the Records Department. LaMunyon testified that such transfers were sometimes used as a "form of discipline." R.Vol. V at 81–82. The record indicates that, along with Wulf's transfer, eight other promotions and transfers occurred. Plaintiff's Ex. 1(a), Appellee's Addendum of Exhibits at 108–09. LaMunyon testified that Wulf was transferred to the Records Department "because of the fact that he was good with details, he did get along with people, and he was a solid supervisor." R.Vol. V at 83. He testified that Wulf's membership in the FOP had nothing to do with his transfer. Wulf testified that he believed the transfer was punishment for his refusal to quit the FOP.

Wulf's attorney wrote another letter to LaMunyon, challenging Wulf's transfer and charging that the transfer "is a direct result of Lt. Wulf's steadfast belief that he has First Amendment rights and his refusal to quit the FOP." Plaintiff's Ex. 10, Appellants' Addendum of Exhibits at 3. LaMunyon did not answer that letter, and took no further action regarding the allegations contained in it. Wulf did not pursue any available grievance procedures to challenge the transfer, nor did he request a transfer out of the Records Department. He did testify, however, that in August of 1980, he unsuccessfully sought permission

to speak to LaMunyon about his (Wulf's) concerns regarding treatment of the FOP.

Wulf's wife, Mary, wrote a letter in October 1980 to the Kansas Attorney General inquiring how "to instigate either a grand jury investigation or an Attorney General's inquisition into what is thought to be a violation of law by a local city official." Plaintiff's Ex. 11, Appellants' Addendum of Exhibits at 4. Thomas Haney, Deputy Attorney General, in response suggested that she discuss the possibility of summoning a grand jury with an attorney, and indicated that the Attorney General's office was unable to evaluate the possibility of conducting its own investigation into the allegedly improper activity without more specific details.

On the advice of an attorney, Wulf began to prepare a letter to the Attorney General requesting an investigation of certain activities and incidents occurring in the Wichita Police Department.[4]

Meanwhile, people within the Wichita Police Department, including LaMunyon, learned of Wulf's letter. Although the testimony is conflicting as to details of time and place, LaMunyon apparently met with Captain Terry Crisp and Officer Peter Dubovich at least once or twice in February 1981 to discuss Wulf's letter, which Dubovich believed had already been sent to the Attorney General. Dubovich testified that when he told LaMunyon of the contents of the letter, LaMunyon responded "If that's the case, I'll have his ass." At trial, LaMunyon could not recall making that statement. He testified that he was "upset" when he learned of the letter. R.Vol. V at 109–10. Crisp also testified that he did not believe that such a statement was made. R.Vol. XV at 34; R.Vol. XXXI at 878. Dubovich testified that either Crisp or LaMunyon said "if he [Wulf] continues to undermine me or this department, he's going to be the first 52–year–old policeman or patrolman on the Wichita Police Depart-

---

4. Wulf testified that he decided not to pursue the possibility of empanelling a grand jury because "it would have exposed a lot of people, many of them police officers within the [Police]

Department, to certain pressures and ridicule" and he wanted to keep the matter more private. R. Vol. VII at 68; R. Vol. XXXII at 1090.

ment." R.Vol. XXX at 784. LaMunyon and Crisp both denied saying that.

Newsreporter Nelson Schock testified that in early March 1981 he talked to Wulf and "just in so many words told Sheldon that he was going to be fired ... because of stuff that was being attributed to him coming out of the department." Schock Deposition at B9, Appellants' Supplemental Addendum of Exhibits. Schock testified that information came "directly from the Chief because the conversation I had with him I assumed that Sheldon was going to get fired if he didn't do things differently." *Id.* Schock testified that he had conversations with other high ranking officers that led Schock to believe that "Sheldon's days were numbered," *id.* at B10, primarily because of "his activity with the Fraternal Order of Police." *Id.*

LaMunyon testified that he told Crisp to keep him informed of any more details he learned about the letter. Dubovich testified that, a day or so after his meeting with Crisp and LaMunyon, Crisp asked him if he could "lay [his] hands on a copy of the letter." R.Vol. XXX at 789. Dubovich said Crisp told him "it would probably shed favorable light when it comes time for promotion." *Id.* at 790. Crisp denied making any promises concerning promotion. Crisp testified that LaMunyon indicated he wanted a copy of the letter, but denied that LaMunyon ever asked him to have Dubovich steal a copy or use subterfuge to obtain a copy.

LaMunyon testified that he notified the City Manager's office and the Attorney General about the existence of the letter. He also said that he visited the Attorney General personally in March 1981, and was told that a copy of the letter would be mailed to him. R.Vol. XXVII at 216, 218. The Attorney General recalled no such visit.

There was also testimony concerning Wulf's activities during this time. Wulf stated that he showed an earlier draft of the letter to several officers who were active in the state FOP. Lieutenant Pat Taylor testified that, in later discussing with Wulf material to be used in the letter, Wulf stated he "would use anything I could to get that son of a bitch." R.Vol. XXXIV at 1426. Wulf testified that, while he could not remember saying that, "[i]t's possible that I could have said something that he [Taylor] took to mean that." R.Vol. VII at 158; R.Vol. XXXIII at 1184. Dave Reavis, the State FOP President in 1981, testified that he "had conversations with Sheldon Wulf where he's indicated he did not like Chief LaMunyon." R.Vol. XXXV at 1578. Reporters Schock and Susan Edgerley testified as to the animosity between Wulf and LaMunyon.

In February 1981, Wulf showed a copy of the letter to Assistant District Attorney Jim Puntch. Puntch testified that Wulf did not request an investigation. District Attorney Clark Owens testified that his office never received an official request to conduct an investigation, R.Vol. XXX at 828, nor did he recall ever seeing a copy of Wulf's letter until after Wulf was fired.

Puntch testified that, after reviewing the letter, he told Wulf that his office would not be concerned with most of the allegations in the letter, as they were not criminal in nature, and that the one possible criminal matter would be difficult to prosecute. Puntch testified that, after he discussed the letter with Wulf, he told District Attorney Clark Owens that there was nothing in the letter to investigate, inasmuch as any investigations would be conducted by the Attorney General.

Owens said that he told LaMunyon on the telephone that he did not intend to file any criminal charges on the basis of the letter. Owens conceded at trial that, had two of the allegations in Wulf's letter proved true, further action would have been "worth pursuing." *Id.* at 840–41.

The letter was finally personally delivered by Wulf and the state FOP President to the Attorney General's office on March 6, 1981. The letter stated in pertinent part:

"We, the Fraternal Order of Police of the State of Kansas, do hereby respectfully request the Attorney General of Kansas to ... accomplish fact-finding investigation and inquisition into the following matters which we feel strongly indicate

violations of the laws of the State of Kansas, First Amendment Rights of the United States Constitution, and rulings of the Supreme Court of the United States.

1. That Richard L. LaMunyon, Chief of Police of Wichita, Kansas, has in the past and is now attempting to dissolve the Fraternal Order of Police Organization, Lodge # 5, and in so doing is in violation of the Laws of the State of Kansas including but not limited to 21–3902, 21–3910, 44–803, 44–806(6), 44–808, and 44–890(12) of the Kansas Statutes Annotated and Supplements thereto:

A. During the period of time September 1979 and October 1979 a number of lieutenants and captains of the Wichita Police Department were told by superiors that for their own expediency it would behoove them to drop their Fraternal Order of Police membership.

. . . . .

2. That Richard L. LaMunyon, Chief of Police of Wichita, Kansas, while strenuously opposing Fraternal Order of Police activity, and while taking drastic disciplinary measure in regard to the FOP stag party, has to the contrary withheld the filing for prosecution in numerous other cases involving violations of liquor and gambling laws as well as the purchase of an illegal drug by a narcotics officer. These other cases were investigated by police officers, evidence obtained, and in some cases laboratory reports completed and reports written by police officers of the Wichita Police Department. We feel the dismissal of these cases should be investigated by the Attorney General. . . .

. . . . .

3. That Richard L. LaMunyon . . . apparently exempted himself from following the written departmental policy in that he did not request a polygraph test after being questioned by District Attorney Vern Miller in regard to a possible misappropriation of city funds, and the investigation was dropped prior to reaching a proper legal conclusion.

. . . . .

4. That Richard L. LaMunyon . . . permits the use of taxpayers' monies in the providing of printing and materials as well as postage, and the use of police department letterhead on occasion, and permits on a regular basis the printing and materials and time for delivery of a document he personally signs in regard to notification of regular and special meetings of the Wichita Christian Police Officers' Association. . . .

. . . . .

5. Gross misconduct on the part of a staff member in the sexual harassment of a subordinate employee."

Plaintiff's Ex. 21, Appellants' Addendum of Exhibits at 9. Specific instances of misconduct were alleged under each numbered paragraph. The letter was purportedly from the President of the State FOP, although it bears no signature. Wulf testified that he and his wife wrote it and that the State FOP Executive Board never endorsed the letter, although a draft of the letter was discussed with at least several members. Wulf further stated that when he delivered the letter, he asked the Attorney General's office to investigate it and to keep his involvement confidential. Deputy Attorney General Thomas Haney testified that Wulf and Reavis were "insistent on confidentiality" and that he was therefore "surprised" when a newspaper reporter called him a few days later to verify the existence of the letter.

Wulf testified that he based the allegations in the letter on various conversations with other police officers and with the people named in the letter and on personal knowledge. With regard to Paragraph 1E, concerning officers allegedly canceling their FOP membership near the time that they were promoted, he conceded he was not able to determine himself that LaMunyon used FOP membership as a criterion for promotion, but that he verified the decline in FOP membership from 1979 to 1980 by checking membership lists.

LaMunyon testified that, at the end of March 1981, he received copies of Wulf's letter at home and at his office. He testi-

fied that he received one from the Attorney General, but the Attorney General and his deputy both denied having any communication or contact with LaMunyon and could not recall sending him a copy of the letter until after Wulf's termination. LaMunyon further testified that, after receiving the letter, he notified City Manager Denton's office and John Dekker of the City Attorney's office. Denton testified that he had told LaMunyon on several occasions to investigate the validity of the accusations contained in the letter. Denton Deposition at A22, A24, Appellants' Supplemental Addendum of Exhibits. LaMunyon testified that he could not recall whether he had been told to investigate the validity of the accusations. Denton further testified that he never received a written report from LaMunyon but that LaMunyon told him orally that the accusations were groundless and that the District Attorney and the Attorney General had determined that Wulf's charges were groundless.[5]

Both the Attorney General and his deputy testified that they discussed Wulf's letter and determined not to pursue any investigation other than a brief check of the alleged liquor law violations by private clubs. Haney testified that, based on a conversation with Assistant District Attorney Puntch, he (Haney) believed that the Wichita District Attorney's office would be making inquiries into the allegations. Haney testified that, pursuant to the policy of turning over investigations to local authorities, he and Owens or Puntch "mutually agreed that they [the District Attorney's office] would take over what needed to be done, if anything, on the complaint." R.Vol. XXXV at 1480–81.

Neither Owens nor Puntch recalled any request by the Attorney General to investigate the letter's allegations, and Owens testified that he had no record in his file of such a request.

LaMunyon said that he decided in mid-April to investigate the letter after he was "convinced" that neither the Attorney General nor the District Attorney was going to investigate the letter any further. He testified that he never authorized or directed his Internal Affairs division to investigate the accuracy of the allegations in Wulf's letter. R.Vol. XXIII at 44; R.Vol. XXXVI at 1771. He also testified that he "had individuals, staff officers primarily, Hicks, Hampton, Crisp, coming to me indicating that this letter was creating problems for them in terms of moral [sic]." R.Vol. XXIII at 26.[6] Hampton testified that the letter was the subject of a "tremendous amount of talk amongst the patrol officers and supervisors." R.Vol. XXIV at 24. He could not, however, recall any specific names of those involved. He later characterized the talk as "just idle gossip and talk amongst the patrol officers and supervisors." Id. at 41; R.Vol. XXXVI at 1711. LaMunyon also testified that at various times he talked to news reporters Susan Edgerling, Bill Hirschman and Nelson Schock about Wulf and the letter. R.Vol. V at 132–41.[7] Schock testified that "[i]t was a situation where I think everybody around was talking about it [the letter] ... everyone was talking about it." Schock

---

5. LaMunyon testified that he contacted the Attorney General's office a few times after he got the letter, and that on one occasion, the Attorney General told him they were looking into the allegations in the letter. He further stated that Deputy Attorney General Haney told LaMunyon the Attorney General's office had looked into the allegations and discussed them and was finished with its investigation. R. Vol. V at 153, 292. Haney recalled no communications with LaMunyon.

6. LaMunyon further stated that he felt Wulf's actions hindered the operation of the Police Department:
"[Wulf's] loyalty and his trust in terms of the burden placed on him was certainly question-

able as to what he was doing within the Police Department. I was concerned of the—what it might do to the production and operation of the Police Department, of the individuals who were being subjected to the rumors, the people that really didn't have the facts. I think it had a serious impact in terms of our operation."
R. Vol. XXIII at 30.

7. LaMunyon testified that he talked to Nelson Schock, now deceased, "every day." R. Vol. V at 132. LaMunyon further testified that he told Schock "if he had anything on Sheldon let me know." Id. at 139.

Deposition at B22–B23, Appellants' Supplemental Addendum of Exhibits.

Susan Edgerley testified that on April 20, 1981, LaMunyon told her that he had the letter, that he was going to investigate it, and that he was going to call Wulf into his office the next day. She also testified that he was "angry." She testified that, later that day, she phoned LaMunyon and he characterized the allegations in the letter as "not worth a damn." LaMunyon testified he did not remember making the latter comment, but said that "[i]t sounds like something I might have said." R.Vol. V at 171.[8]

Edgerley, accompanied by Hirschman, met Wulf and his wife at the Wulfs' house that evening and were shown a copy of the letter. Both Wulf and his wife testified that the reporters told Mary Wulf that her husband was going to be fired and possibly sued because of the letter.[9] The reporters either denied or could not recall any such statement. The reporters wrote a story concerning the letter, which appeared in the next morning's newspaper. The story summarized the contents of the letter, reported that neither the Attorney General nor the District Attorney planned to investigate the letter's accusations, that LaMunyon intended to investigate the letter, and

that LaMunyon characterized the letter's contents as "not worth a damn."

The morning the story appeared in the newspaper, April 21, 1981, LaMunyon testified that he read the story and decided to commence his investigation immediately.[10] Without any prior warning to Wulf, LaMunyon summoned him and two internal affairs investigators to his office. Wulf appeared in LaMunyon's office at 7:10 a.m.[11] The transcript of the meeting reveals that LaMunyon began by stating in part:

"[Y]ou are being questioned as part of an official investigation, police department. I want to further advise you that if you refuse to testify or to answer questions or if you don't tell us the truth relating to the performance of your official duties or the fitness of your duties you will be subject to departmental charges which could result in dismissal from the police department. At the same time I want to inform you that any information obtained here cannot and will not be used against you in any criminal proceeding."

Plaintiff's Ex. 22(a), Appellants' Addendum of Exhibits at 25. Wulf then asked if he had the right to have an attorney present, and was told he did not. Wulf refused to answer any questions concerning the letter unless he was permitted to talk to his attor-

---

**8.** LaMunyon also testified that he did not remember telling Edgerley that he was going to investigate the allegations or that the Attorney General and District Attorney had investigated the letter's allegations and cleared LaMunyon.

**9.** Nelson Schock also testified that he told Wulf at some point that he was "going to get fired, that that was my conclusion from talking to various people." Schock Deposition at B24, Appellants' Supplemental Addendum of Exhibits. He later testified "I think I drew the conclusion really that Sheldon was going to be fired after my conversation with Chief LaMunyon because I realized at that point that Chief LaMunyon was serious." *Id.* at B34. Wulf testified, and recorded in his notebook, that Schock had told him that LaMunyon was "out to get [him]." R. Vol. VII at 81–82.

**10.** Wulf testified that "in the morning hours" of April 21, reporter Nelson Schock told Wulf "that [he] should watch [his] step, be very careful, because the Chief was out to get [his] job." R. Vol. XXXII at 1102.

**11.** LaMunyon testified that the normal hours for Internal Affairs investigations are between 8:00 a.m. and 5:00 p.m. LaMunyon also testified that the usual Internal Affairs procedure permits an officer to have twelve hours in which to respond to and write a report concerning a complaint against the officer. Wulf was not given an opportunity to submit a report. LaMunyon's explanation for conducting the interview with Wulf at 7:10 a.m. was that Wulf's shift ended at 7:00 a.m. and, because of the newspaper article, there was "an emergency situation." R. Vol. V at 186. Furthermore, the procedure permitting the employee to submit a report need not be followed where the employee is suspected of criminal conduct, and LaMunyon testified that he suspected Wulf of criminal conduct in the form of "taking private security records and giving them to non-law enforcement people." R. Vol. V at 42–43. Finally, LaMunyon testified that he viewed the provision giving an officer twelve hours in which to respond to a complaint as applicable only to "external complaints," not to internal investigations of the type involving Wulf.

ney. After repeatedly telling Wulf that he had no right to an attorney in an internal administrative meeting, LaMunyon "order[ed]" Wulf to answer his questions. Wulf repeatedly declined "until I talk to my attorney." *Id.* at 25–28. LaMunyon then fired Wulf for insubordination. LaMunyon testified that, had Wulf answered LaMunyon's questions, he probably would have suspended him pending an investigation and that, in light of what LaMunyon later learned about Wulf's activities, he "probably eventually" would have terminated him. R.Vol. V at 269; R.Vol. XXVII at 359–60. LaMunyon testified that Wulf's termination had "[n]o direct effect on maintaining discipline." R.Vol. V at 269; R.Vol. XXIII at 63–64.

The record reveals no prior acts of insubordination by Wulf. The record also reveals that, for the years 1978 through 1981, no other officer was fired for a first act of insubordination.[12] Officer Pat Taylor testified that, at one point, he was interviewed by Internal Affairs and that he refused to answer questions, but he was not disciplined. R.Vol. XXXIV at 1427.

LaMunyon testified that later that morning he contacted Denton to tell him that he had fired Wulf. Denton testified at trial that LaMunyon could only recommend ter-

mination, and that technically, Wulf was only suspended until the final decision to terminate him was made by Denton. R.Vol. XXXVI at 1724.[13] Denton told LaMunyon to check with the City's legal staff and to check the personnel rules and police department regulations to ensure that Wulf had been properly terminated. LaMunyon testified that, later in the day of April 21, he told Denton that he had checked with the legal staff. Denton testified that he then decided to uphold LaMunyon's recommendation that Wulf be terminated. Denton stated that the "only consideration [in his decision to terminate Wulf] was his failure to cooperate ... with an order of a superior officer." R.Vol. XXII at 10–11.[14]

Another newspaper article appeared on April 22, which described Wulf's termination.[15] LaMunyon testified that he could not remember making any of the statements attributed to him in the article. R.Vol. V at 326–27.

LaMunyon then abandoned his investigation into the letter because it "was actually causing a bigger riff within the Police Department." R.Vol. XXIII at 32–33. He never received a written report from his Internal Affairs division concerning the in-

---

**12.** In response to interrogatories from Wulf, the City stated that no officers were terminated for a first act of insubordination during those years. LaMunyon disputed that fact at trial, but conceded that the City's records did not reflect that any other officers had been terminated for a first act of insubordination. R. Vol. V at 68–75. Denton testified that "we have dismissed officers for their refusal in an internal investigation ... if they do not cooperate.... I can't give you a specific instance but I think there have been a number of them over my tenure here." Denton Deposition at A30–31, Appellants' Supplemental Addendum of Exhibits.

**13.** In his deposition, which was read into the record in this case, Denton stated that LaMunyon recommended that Wulf be "suspended." At trial, Denton explained his use of that terminology in his deposition as follows:

"The word suspended is my word. There was never any doubt in my mind about the recommendation of the Police Chief in the morning or that afternoon after he had made the consultations with the lawyer. Suspension was my word, I did use it. Technically, suspension is something that department

heads do. Only the City Manager can terminate an employee. So he recommended termination. And until the employee is terminated, he is suspended. And the termination of the employee is, and was in this case, completed and accomplished subsequent to all these discussions."

R. Vol. XXXVI at 1724.

**14.** Although Denton made his initial decision that day, that decision was subject to reversal upon reevaluation after Wulf pursued the available grievance procedures discussed more fully *infra.*

**15.** The newspaper article included the following statement:

"Asked if he did in fact ever put the FOP private club under surveillance, or encourage officers to resign from the fraternal organization, the chief said:

'I am not going to comment on any of that at all, period. But even if I did, what's illegal about it? But I don't care to discuss it here.'"

Appellants' Supplemental Addendum of Exhibits at D68.

vestigation into the letter. R.Vol. V at 197. He testified that he could not remember the substance of any oral reports from Internal Affairs concerning the investigation into the letter's allegations.

After Wulf received his formal termination notice, he pursued the grievance procedures contained in the City's Administrative Policy and Procedure Manual. There was a mediation conference conducted by Sam Rothe, the City's Employee Relations Officer, and attended by Wulf, Wulf's lawyer, LaMunyon, and an Assistant City Attorney. The mediation failed when Wulf refused to accept anything less than reinstatement with full back pay and rejected an offer to work in any City department other than the Police Department. Rothe then conducted a fact-finding proceeding, in which he interviewed LaMunyon and Wulf, reviewed the transcript of Wulf's termination interview and his termination letter, reviewed Wulf's personnel file contained in the City's Personnel Office, and read the newspaper articles concerning the letter Wulf had written to the Attorney General. In his report to Denton, Rothe stated that "[b]oth the Attorney General and ... [the] County Attorney conducted investigations into the allegations [contained in Wulf's letter].... [and] these investigations were dropped for lack of evidence." Plaintiff's Ex. 32, Appellants' Addendum of Exhibits at 35. He went on to conclude that "[t]here is no doubt Lt. Wulf was insubordinate ... in refusing to cooperate and disobeying a direct order of the Chief...." and he recommended that Wulf's termination be sustained. *Id.* at 36.[16]

Denton then denied Wulf's grievance in a letter dated May 28, 1981, in which he stated:

"It is obvious your conduct was insubordinate. You refused to cooperate with an internal investigation and then dis-

obeyed a direct order from your superior. For these reasons your grievance is denied."

Plaintiff's Ex. 33, Appellants' Addendum of Exhibits at 42. Denton testified that normally, he and Rothe would discuss Rothe's recommendation, although he could recall no specific meeting with Rothe concerning Wulf's termination. He further testified he did not review Wulf's personnel file, as he "didn't feel it was pertinent." He also did not review the penalty section for acts of insubordination, contained in the City of Wichita Police Department Rules and Regulations.

Wulf appealed that decision to the City Personnel Advisory Board (the "Board"), composed of four private citizens and one City employee. The Board held a hearing on June 30, 1981, in which it heard testimony from Wulf and LaMunyon, reviewed the transcript of the termination interview, and heard opening and closing statements from Wulf's and LaMunyon's lawyers. Wulf's attorney, as well as the Board members, questioned both Wulf and LaMunyon. Later that day, the Board sent a letter to Denton, stating in part:

"[T]he Board has concurred with the termination of Mr. Wulf for insubordination.

The Facts clearly indicated that refusing to cooperate and disobeying a direct order of the Chief of Police was an act of insubordination. The Chief of Police was within City policy and had full authority to terminate Wulf. We believe the actions of Mr. Wulf would be considered good cause for termination in a fair minded, well run business organization."

Plaintiff's Ex. 41, Appellee's Addendum of Exhibits at 335. Denton concurred with the Board's report and findings, and sustained Wulf's termination.[17] He so notified

16. LaMunyon testified that he could not remember whether he told Rothe that the District Attorney and Attorney General had investigated the allegations in Wulf's letter and that he, LaMunyon, had been completely cleared. Rothe testified that he had gotten that information from LaMunyon and from the newspaper article. R. Vol. XXVIII at 456.

17. The Board's opinion is merely advisory, and the City Manager need not accept it. Denton testified, however, that he has never changed a recommendation as given to him by the Personnel Advisory Board. Denton Deposition at A36, Appellants' Supplemental Addendum of Exhibits.

Wulf by letter dated the same day, June 30, 1981. Plaintiff's Ex. 41, Appellee's Addendum of Exhibits at 334.

Wulf testified that the loss of his job was "very stressful." R.Vol. VII at 108. He testified that he had been "angry," "depressed," "scared," and "frustrated." *Id.* at 110. His wife testified that "he was under a tremendous emotional strain." R.Vol. XXXIII at 1240. She also testified that they had "tremendous financial difficulty." *Id.* at 1244.

After he was fired, Wulf applied for several jobs, including the position of Police Chief of Park City, Kansas. LaMunyon testified that when the City Administrator for Park City called him to inquire about Wulf, LaMunyon told him that Wulf "had a reputation for being a good officer, a good investigator" but that "[LaMunyon] personally had some serious problems with [Wulf] in that he had accused [LaMunyon] of basically being a crook, which [LaMunyon] took personal exception with, and [that Wulf] had filed a lawsuit against [LaMunyon]." R.Vol. V at 240. He testified at trial that he did not remember telling the City Administrator that Wulf did not have his facts together when he went to the Attorney General's office, but said that he "might have." *Id.* at 241. Wulf did not receive the job of Police Chief of Park City. Schock testified that he spoke with someone in Park City who said "when Chief LaMunyon said that they could not have a good working relationship with the Wichita Police Department or he couldn't have a good working relationship that Sheldon was not hired." Schock Deposition at B18, Appellants' Supplemental Addendum of Exhibits.

Unable to find other employment, Wulf began his own private investigation business in the summer of 1982. He testified that the Wichita Police Department interfered with that business by denying him access to the Police Department's evidence locker because it was "disruptive" for him to go into the Police Department. Wulf testified that, while he would have been eligible to draw retirement at age 55, "ordinarily [he] would have worked through at

least the 20 years and possibly on." R.Vol. XXXII at 1130.

Wulf then brought this action under 42 U.S.C. § 1983, alleging that his termination was a violation of his First Amendment right to freedom of speech and of association and to petition government for redress of grievances and his Fourteenth and Fifth Amendment rights to due process and equal protection. He sought declaratory and injunctive relief, as well as money damages. After a trial to the district court, the court held that Wulf failed to show that he had been deprived of a property interest without due process, but that Wulf *was* deprived of a liberty interest without due process. *Wulf v. City of Wichita*, 644 F.Supp. 1211, 1221–23 (D.Kan.1986). The court found no equal protection violation.

With respect to Wulf's First Amendment claim, the district court held that Wulf's letter to the Attorney General involved matters of public concern, and that Wulf's interest in writing the letter outweighed defendants' interest in firing him because of it. The court then found that Wulf had met his burden of proving that the letter he wrote was a substantial or motivating factor in the decision to fire him, and that defendants had failed to meet their burden of proving that they would have fired Wulf anyway. The district court held that Wulf had established both LaMunyon's and Denton's personal liability and that no good faith immunity shielded them. Finally, the court held that the City was liable because Denton and LaMunyon were "the City's official policy-makers" whose decision, a deliberate choice to terminate Wulf, "formed the basis of the constitutional tort." *Id.* at 1226.

■ The court then awarded Wulf front pay in lieu of reinstatement, back pay and lost benefits. The total amount awarded for "back pay, loss of use of income and taxes" was $242,465.95. *Id.* The court awarded Wulf front pay "calculated at the 1985 rate for a police lieutenant F step until retirement at 65 years of age, with an additional factor for taxes, in the amount of $389,806.42." *Id.* at 1226–27. It directed the parties to "clarify ... by way of

stipulation" how the award of front pay should be discounted to its present value. *Id.* at 1227. Ultimately, the court awarded a discounted figure of $210,177.00.[18] The court further ordered:

"[I]f at the time of Wulf's death he is married to Mary Wulf, she shall be entitled to the widow's benefits provided to all officers with twenty years or more of service. In addition, the City is ordered to contribute its share of the plaintiff's pension through February 22, 1986, which will allow Wulf to receive the additional pension benefits for completing twenty years of service."

*Id.* Defendants do not appear to challenge this on appeal. The court also awarded Wulf $250,000.000 for "mental anguish and emotional distress," finding that he had endured "significant emotional pain and suffering." *Id.* Finally, the court awarded $50,000 in punitive damages against La-Munyon alone because "[a]t worst, LaMunyon's conduct was malevolent, at best, it exhibited a callous disregard for Wulf's constitutional rights." *Id.*[19] Subsequently, the court entered attorneys' fees in favor of Wulf in the amount of $272,725.15 and expenses of $7,676.70. Defendants timely appealed the finding of liability, the award of damages and the award of attorneys' fees.

## DISCUSSION

### I. First Amendment

■ "It is clearly established that a State may not discharge an employee on a basis that infringes that employee's consti-

tutionally protected interest in freedom of speech." *Rankin v. McPherson,* 483 U.S. 378, 107 S.Ct. 2891, 2896, 97 L.Ed.2d 315 (1987); *see also Connick v. Myers,* 461 U.S. 138, 142, 103 S.Ct. 1684, 1687, 75 L.Ed.2d 708 (1983); *Melton v. City of Oklahoma City,* 879 F.2d 706 (10th Cir.1989); *Koch v. City of Hutchinson,* 847 F.2d 1436, 1440 (10th Cir.1988) (en banc), *cert. denied,* —— U.S. ——, 109 S.Ct. 262, 102 L.Ed.2d 250. The "threshold question" in determining whether an adverse employment decision violates the employee's First Amendment rights is whether the speech at issue is on a matter of "public concern." *Rankin,* 107 S.Ct. at 2896–97; *Connick,* 461 U.S. at 146, 103 S.Ct. at 1689; *Koch,* 847 F.2d at 1440. If it is, the court must "balance ... the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Rankin,* 107 S.Ct. at 2896 (quoting *Pickering v. Bd. of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968)). As we will explore more fully below, the truth or falsity of the speech in question is relevant to this inquiry. The inquiry into whether the speech is protected is a question of law, reviewable de novo on appeal. *See Rankin,* 107 S.Ct. at 2897 n. 9; *Connick,* 461 U.S. at 148 n. 7, 103 S.Ct. at 1690 n. 7; *Melton,* 879 F.2d at 713; *Koch,* 847 F.2d at 1441.[20]

■ Upon a finding that the speech in question is constitutionally protected, the plaintiff must prove that the speech was a

---

**18.** The parties never succeeded in satisfactorily devising an appropriate means for discounting the award to its present value. The district court accordingly determined that a net discount rate of 3% was appropriate, which reduced the front pay award to $210,177.00. The parties were unable to agree on a tax-adjusted figure, so the court concluded "that the only equitable solution is to enter judgment on the net discounted damage award of $210,177.00, which figure has not been adjusted for tax consequences in either direction [either upward to compensate Wulf for any taxes he might have to pay on the lump sum award or downward to reflect taxes which Wulf would have paid on the sum as he earned it]. The plaintiff will simply have to brook whatever the tax consequences

may be." R. Vol. III at tab 120 (Memorandum and Order, April 17, 1987 at 3–4).

**19.** The district court correctly noted that municipalities are not liable for punitive damages. *See City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 271, 101 S.Ct. 2748, 2762, 69 L.Ed.2d 616 (1981); *Vinyard v. King,* 728 F.2d 428, 433 (10th Cir.1984).

**20.** This court has also noted, however, that "the underlying historical facts upon which the constitutional claim is grounded are subject to the traditional standards of review governing the treatment of historical facts in any other case." *Saye v. St. Vrain Valley School Dist. RE–1J,* 785 F.2d 862, 865 (10th Cir.1986).

substantial or motivating factor in the challenged employment decision. *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Conaway v. Smith* 853 F.2d 789, 795 (10th Cir.1988); *Saye v. St. Vrain Valley School Dist. RE–1J,* 785 F.2d 862, 866 (10th Cir.1986). The burden then shifts to the defendant to show "by a preponderance of the evidence that it would have reached the same decision ... in the absence of the protected activity." *Saye,* 785 F.2d at 866 (quoting *Childers v. Independent School District,* 676 F.2d 1338, 1341 (10th Cir.1982)); *see also Koch,* 847 F.2d at 1440 n. 11. These latter questions are ones of fact. *Id.*

■ Consistent with the above framework, we turn first to the question of whether Wulf's letter was on a matter of public concern. Speech on matters of public concern has been defined as speech "fairly considered as relating to any matter of political, social, or other concern to the community." *Connick,* 461 U.S. at 146, 103 S.Ct. at 1689. Such speech is contrasted with speech "as an employee upon matters only of personal interest." *Id.* at 147, 103 S.Ct. at 1690.

This public concern inquiry requires a court to consider the content, form and context of the speech at issue, as revealed by the whole record. *Rankin,* 107 S.Ct. at 2897; *Connick,* 461 U.S. at 147–48, 103 S.Ct. at 1690–91; *Melton,* 879 F.2d at 713. Considering these elements, we hold that Wulf's letter to the Attorney General constituted speech on a matter of public concern.

As we noted in *Koch,* "many courts have particularly focused on the extent to which the content of the employee speech was calculated to disclose wrongdoing or inefficiency or other malfeasance on the part of governmental officials in the conduct of their official duties." *Koch,* 847 F.2d at 1445–46 & n. 17 (and cases cited therein); *see also Brawner v. City of Richardson, Texas,* 855 F.2d 187, 191–92 (5th Cir.1988); *Conaway v. Smith,* 853 F.2d at 796; *McMurphy v. City of Flushing,* 802 F.2d 191, 198 (6th Cir.1986); *O'Brien v. Town of Caledonia,* 748 F.2d 403, 407 (7th Cir.1984); *Brockell v. Norton,* 732 F.2d 664, 668 (8th Cir.1984).

Wulf's letter alleged interference with the right of supervisory police officers to join the FOP; unfair treatment of the FOP private club vis-a-vis other private clubs; misappropriation and misuse of public funds; and sexual harassment of one officer by a supervisor. As we have indicated, defendants assert that such allegations are either false or trivial or relate to lawful activities. We disagree with defendants' characterization of the letter.

Defendants argue that there was nothing unlawful about LaMunyon's discouragement of supervisory membership in the FOP, and that in fact such behavior was permitted by the Kansas Public Employer–Employee Relations Act, Kan.Stat.Ann. § 75–4325.[21] By its terms, section 75–4325 permits a supervisory employee to become or remain a member of an employee organization. The parties direct us to no legislative history or cases which might shed further light on the meaning of this section.[22] Accordingly, we are unpersuaded

21. Kan.Stat.Ann. § 75–4325 (1984) provides as follows:
"75–4325. Supervisory employee not prohibited from membership in employee organization. Nothing herein shall prohibit any individual employed as a supervisory employee from becoming or remaining a member of an employee organization, but no public employer subject to this act shall be compelled to deem individuals defined herein as supervisory employees as public employees for the purposes of this act."

22. This court considered in general terms the right of a city to prevent union membership by supervisory personnel in *Key v. Rutherford,* 645

F.2d 880 (10th Cir.1981). In *Key,* the former police chief of the City of Stroud, Oklahoma sued the City and others, alleging that he had been discharged because he exercised his First Amendment rights, including "his participation in the formation of an FOP chapter and his public support for the group." *Id.* at 885. We noted that:
"A city may prevent union membership of managers and supervisory personnel if it can show there is a substantial state interest in the limitation on associational rights and that the limits employed are narrowly drawn to avoid unnecessary abridgement of such rights."

by defendants' assertion that LaMunyon could lawfully have ordered supervisory employees to leave the FOP. Thus, an allegation of activity contravening a statutory right to belong to a union would clearly be on a matter of public concern. *See McKinley v. City of Eloy*, 705 F.2d 1110, 1114 (9th Cir.1983) (court found speech on matters of public concern where it dealt with "the working relationship between the police union and elected city officials.") As to the accuracy of the allegations, while there was conflicting evidence as to the substance or, in some instances, even the occurrence of numerous conversations in which "orders" allegedly discouraging FOP membership were made or discussed, there was sufficient evidence of discouragement of FOP membership by supervisory employees to uphold the district court's finding that that allegation was substantially correct.[23]

Defendants also argue that the allegations of anti-union activity had diminished significance because they were "dreadfully stale." While defendants correctly point out that virtually all of the specific allegations of discouragement of union membership occurred in late 1979, in the months immediately following the stag party, they overlook other evidence indicating that the problem was on-going. Officer Ray Floyd stated in April 1981 his perception that there was a "general feeling by a lot of people on [sic] the Department that if they are associated with the FOP, their likelihood of being promoted or such is very poor." R.Vol. XXXV at 1526–27. The decline in FOP membership continued throughout 1980. LaMunyon conceded

that a November 22, 1981 newspaper article, in which he was quoted as saying he was not on speaking terms with FOP leadership, was essentially accurate. Viewed as a whole, the evidence supports the district court's conclusion that the allegations of interference by LaMunyon with the union were substantially correct and were of public concern for First Amendment purposes.

 We find the other allegations in Wulf's letter to be on matters of public concern as well, despite defendants' assertion that they are malicious, false or trivial. It is true, as defendants argue, that some false statements may lose First Amendment protection and it is therefore relevant to consider the truth or falsity of the speech in question. *See Pickering*, 391 U.S. at 574, 88 S.Ct. at 1737; *Solomon v. Royal Oak Township*, 842 F.2d 862, 866 (6th Cir.1988); *American Postal Workers Union v. Postal Service*, 830 F.2d 294, 306 (D.C.Cir.1987); *Jett v. Dallas Independent School Dist.*, 798 F.2d 748, 758 (5th Cir. 1986), *aff'd in part and remanded in part*, —— U.S. ——, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989); *Brasslett v. Cota*, 761 F.2d 827, 839 (1st Cir.1985); *O'Brien v. Town of Caledonia*, 748 F.2d at 407 n. 2. In particular, a knowingly or recklessly false statement is unlikely to be protected under the First Amendment, although the Supreme Court has left open the possibility that even such a statement might merit First Amendment protection where no harmful effects can be shown. *See Pickering*, 391 U.S. at 574 n. 6, 88 S.Ct. at 1738 n. 6; *Brasslett*, 761 F.2d at 840.[24]

*Id.; see also Saye v. St. Vrain Valley School Dist. RE–1J*, 785 F.2d at 867 n. 2. Key argued that "the FOP is not a union but a fraternal organization for the professional advancement of law enforcement." *Key*, 645 F.2d at 885. We held that, on retrial, "the district court must determine whether the FOP is the type of association in which membership by the police chief could sufficiently conflict with the city's interest in an efficient police department." *Id.* No such argument has been made in this case, nor is there evidence from which to evaluate the nature of the FOP.

the officers who reported such conversations as to LaMunyon's direct involvement as dispositive of LaMunyon's responsibility for the alleged anti-union activity. As Captain Vergil Ternes testified, it was assumed that superior officers spoke with the authority of their own superiors in the hierarchical structure of the police department. In addition, Lieutenant Harold Holtz testified as to a conversation in which Captain Troy Hampton reported an "order" by LaMunyon for captains to resign from the FOP. That conversation was included in the allegations of Wulf's letter.

**23.** We do not view the lack of any testimony by

Defendants characterize paragraph 2 of Wulf's letter as "blatantly and maliciously false." That paragraph alleges that LaMunyon vigorously prosecuted the FOP private club for various violations occurring during the stag, but failed to prosecute other private clubs for comparable violations, and failed to pursue an alleged drug sale to a narcotics officer.

We find that the record does not support the conclusion that these allegations were "knowingly or recklessly false." Wulf testified that he based the allegations of that paragraph on conversations he had with other police officers. While Wulf conceded that, when he wrote the paragraph, he did not have evidence that LaMunyon himself was involved in the failure to prosecute the other private clubs, the gist of the allegation was that the FOP private club was more harshly treated than other private clubs for comparable violations. There *was* evidence that LaMunyon was involved in the severe discipline meted out to the FOP private club. While it may have been proper for LaMunyon to severely sanction a police private club for liquor and gambling law violations, because of his concern about the public image of the police department, we do not view Wulf's expressed concern about allegedly disparate treatment as maliciously or recklessly or knowingly false. It was a suspicion on his part, which he wished investigated. Such a suspicion, alleging unfair treatment of a union private club, touches upon a matter of public concern for First Amendment purposes. *See O'Brien v. Town of Caledonia*, 748 F.2d at 407 n. 2 ("It does not matter whether or not O'Brien's suspicions were subsequently demonstrated to be correct."); *see*

*also Brasslett v. Cota*, 761 F.2d at 841; *Trotman v. Bd. of Trustees*, 635 F.2d 216, 226 (3d Cir.1980), *cert. denied*, 451 U.S. 986, 101 S.Ct. 2320, 68 L.Ed.2d 844 (1981).

Defendants assert that the allegations of paragraph 3 of Wulf's letter, involving the allegedly improper use of undercover drug fund money by LaMunyon to repay money taken by a police officer from a citizen's wallet, are misleading because they fail to reveal that the money taken was replaced in the drug fund from the police officer's next paycheck. They also argue that the letter incorrectly accuses LaMunyon of exempting himself from a departmental polygraph policy, whereas in fact no such policy exists. We agree with Wulf that what makes this incident a matter of public concern is the allegation of concededly improper use of public funds (the undercover drug funds), along with the allegation that LaMunyon attempted to cover up that improper use by stating, in response to an inquiry from the press, that he had repaid from his own pocket the money taken from the citizen's billfold. Clark Owens, the District Attorney for the City at the time of trial, testified that if he had known that the allegations in that paragraph were true, those allegations would be "worth pursuing." The fact that the amount of money involved is small and that LaMunyon did not personally profit from the incident does not persuade us that the incident is not of public concern. The allegations still assist the public in "evaluating the performance of" LaMunyon. *Connick*, 461 U.S. at 148, 103 S.Ct. at 1690.

■ LaMunyon does not dispute the impropriety of his conduct as alleged in Para-

---

**24.** Presumably, the issue of the truth or falsity of the statements at issue is relevant to both the threshold public concern analysis and the balancing required under *Pickering*. It is difficult to see how a maliciously or recklessly false statement could be viewed as addressing a matter of public concern. Nonetheless, a merely erroneous statement *may* be of public concern. *See Brasslett v. Cota*, 761 F.2d at 844. Similarly, under *Pickering's* balancing test, as the First Circuit noted in *Brasslett*, an employer will have a significant interest in "curtailing deliberate falsehoods," while the employee's interest in

making such statements will, of necessity, be slight, whereas merely "erroneous statements of public concern will be protected unless they are shown to have interfered with the employee's performance or the regular operation of his governmental agency." *Id.* at 839, 844. We address the falsity issue here, in the context of our public concern analysis, but note that the finding that a statement is or is not maliciously or recklessly false is a factor to be considered in both the public concern and the *Pickering* balancing analyses.

graph 4 of Wulf's letter.[25] Paragraph 5 of Wulf's letter alleged sexual harassment of a subordinate female police officer by Captain Troy Hampton. Allegations of sexual harassment have been found to involve matters of public concern. *See Wren v. Spurlock*, 798 F.2d 1313, 1317 (10th Cir. 1986), *cert. denied*, 479 U.S. 1085, 107 S.Ct. 1287, 94 L.Ed.2d 145 (1987). In this particular case, while there was conflicting testimony as to whether the alleged incident of harassment happened, there is no indication in the record that Wulf acted recklessly or made a knowingly false statement. At most, Wulf in good faith misinterpreted the nature of the contact he witnessed between the female officer and Hampton. In any event, since we have concluded that

the remaining allegations in Wulf's letter involve matters of public concern, the fact that this latter incident may not, because the evidence that it ever even occurred is disputed, is immaterial. *See Connick*, 461 U.S. at 149, 103 S.Ct. at 1691; *see also Brawner v. City of Richardson, Texas*, 855 F.2d at 192 ("[I]t is clear that only a portion of a communication need address a matter of public concern.").[26]

We turn now to balancing Wulf's interest in writing the letter against the interest of defendants in "promoting the efficiency of the public services it performs through its employees." *Rankin*, 107 S.Ct. at 2896 (quoting *Pickering*, 391 U.S. at 568, 88 S.Ct. at 1734). In performing the requi-

---

**25.** Paragraph 4 alleged that LaMunyon used the police department's letterhead and postage meter to mail notices of meetings of the Wichita Christian Police Officer's Association, of which LaMunyon was the founder. LaMunyon conceded at trial that was "inappropriate." After he learned of the allegations in Wulf's letter, LaMunyon sought and received opinions from both the District Attorney and the City Attorney that his actions with regard to the mailing were improper. LaMunyon then directed the Christian Police Officers' Association to reimburse the City for the mailings, which it did.

**26.** We have concluded that the content of Wulf's letter strongly supports a finding of public concern. The form and context of the letter also support such a finding. The form of the speech, a formal letter to the Attorney General seeking an investigation of alleged misconduct by a public official, emphasizes the public concern element. *See Czurlanis v. Albanese*, 721 F.2d 98, 104 (3d Cir.1983) (allegations of state agency inefficiency, waste and fraud made to "body with legislative power and investigative power germane thereto" are on matter of significant public concern). Wulf testified that he decided *to proceed with that format on the advice of an attorney*. Nothing in the form of Wulf's letter diminishes its public importance.

With regard to the context of the letter, defendants argue that the letter arose out of Wulf's displeasure at being transferred to the Records Department and was the culmination of a personal vendetta by Wulf against LaMunyon. They thus suggest that this case is similar to *Connick*, where the Supreme Court found that most of the questionnaire circulated by the employee was a "mere extension[ ] of [her] dispute over her transfer to another section of the criminal court" and therefore *not on a matter of public concern. Connick*, 461 U.S. at 148, 103 S.Ct. at 1690. There was testimony as to the animosity between Wulf and LaMunyon, and as

to statements by each evidencing a desire to "get" the other. Nonetheless, we do not view Wulf's letter as a mere extension of a personal dispute with LaMunyon. While the letter was written after Wulf's transfer, which he believed was in retaliation for his refusal to quit the FOP, Wulf's concern about LaMunyon's treatment of the FOP and LaMunyon's views about supervisory membership in the FOP preceded the transfer. Indeed, many of the allegations in the letter concerned events occurring prior to Wulf's transfer.

Additionally, even the questionnaire in *Connick*, which the Court viewed as simply an extension of a personal dispute between employer and employee, contained one matter of public concern. Similarly, Wulf's letter, while arguably linked to some degree to his personal dispute with LaMunyon and to his dissatisfaction with his transfer to the Records Department, which he viewed as retaliatory, contains allegations of public concern. *See Belk v. Town of Minocqua*, 858 F.2d 1258, 1264 (7th Cir.1988) ("As was true of Myers' survey in *Connick*, Belk's allegations are bound up in a personal dispute with her employer. Similarly, just as Myers' questionnaire raised an issue of public concern, the substance of Belk's threatened grievance undeniably relates to matters of concern to the public."); *Hall v. Ford*, 856 F.2d 255, 260 (D.C.Cir.1988) ("But neither does a topic otherwise of public concern *lose* its importance merely because it arises in an employee dispute.") (emphasis original); *Rode v. Dellarciprete*, 845 F.2d 1195, 1202 (3d Cir.1988) ("Dismissing Rode's speech as unprotected merely because she had a personal stake in the controversy fetters public debate on an important issue because it muzzles an affected public employee from speaking out.").

Thus, the context of the letter does not negate our conclusion that it touched upon matters of public concern.

site balancing under *Pickering,* we must bear in mind the heightened interest of a police department in maintaining discipline and harmony among employees. *See Koch,* 847 F.2d at 1452 n. 22 (and cases cited therein); *Waters v. Chaffin,* 684 F.2d 833, 836, 839 (11th Cir.1982).

*Pickering* directs us to consider a number of factors in balancing the competing interests at stake. "[T]he manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose." *Rankin,* 107 S.Ct. at 2898 (citing *Connick,* 461 U.S. at 152–53, 103 S.Ct. at 1692–93). Pertinent considerations include "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin,* 107 S.Ct. at 2899.

Taken together, the above factors reveal that the state's interest "focuses on the effective functioning of the public employer's enterprise." *Id.* Considering those factors, we find that Wulf's interest in writing the letter outweighed defendants' interest in discharging him. While there was some testimony that Wulf's letter caused controversy among officers and was the topic of conversation, those conversations were also described as "just idle gossip and talk," and there was no evidence that the letter adversely affected discipline. More importantly, there was evidence that at least some of the allegations in Wulf's letter, concerning different treatment of the FOP private club than other private clubs and efforts by superior officers to discourage lieutenants and other supervisory officers from belonging to the FOP, were already the topic of discussion and concern *before* Wulf wrote his letter. To the extent there was controversy and disruption occasioned by the allegations relating to the FOP, those were not entirely *caused by* Wulf's letter; rather, they were a partial inspiration for Wulf's letter. *See Solomon v. Royal Oak Township,* 842 F.2d at 866.

Similarly, the letter did not adversely affect "close working relationships for which personal loyalty and confidence are necessary." *Rankin,* 107 S.Ct. at 2899. There was testimony that LaMunyon, the person most directly criticized by the letter, was angry and upset when he learned of the letter, but LaMunyon was not someone with whom Wulf worked closely or regularly. Indeed, Wulf and LaMunyon were separated by the chain of command, and Wulf had to seek permission to speak to LaMunyon about Wulf's concerns about the department. Additionally, Wulf did not address the letter to LaMunyon or to any other person with whom he would have regular contact, and when he did finally deliver the letter to the Attorney General, he insisted on confidentiality. Although Wulf showed drafts of the letter to a few other officers, as well as to Assistant District Attorney Jim Puntch, there is no evidence that his showing the drafts, or the final delivery of the letter, had any impact on his relationship with those other officers or with Puntch or on any other relationships, except that with LaMunyon.

There is also no evidence that the letter either demonstrated Wulf's lack of fitness to perform his duties or "impede[d] the performance of [his] duties." *Id.* Indeed, Wulf's personnel record reveals that he was consistently evaluated as a competent and satisfactory employee. While his evaluation for the year March 1979 through March 1980 (*before* he wrote the letter) expressed a concern about Wulf distinguishing between the "dual job relations of ... supervisor and FOP office holder," he nonetheless was evaluated as "competent" in every area and overall.

Finally, there was insufficient evidence that Wulf's writing of the letter interfered with the police department's "regular operation." *Rankin,* 107 S.Ct. at 2898. LaMunyon's otherwise essentially unsubstantiated testimony that Wulf's "loyalty and his trust in terms of the burden placed on him was certainly questionable ... I think it [the letter] had a serious impact in terms of our operation," does not persuade us to the contrary. There has been some confusion

about how much disruption must be shown before an employer may discipline or sanction an employee because of that employee's protected speech. *See Melton,* 879 F.2d at 716. Some circuits suggest that a reasonable belief that disruption will occur is sufficient in certain circumstances. *See id.* at 716 n. 11. However, "purely speculative allegations" are insufficient. *Id.*[27] Although LaMunyon testified that he felt the letter disrupted the operations of the department, insufficient evidence supporting or demonstrating such disruption was presented. *See Key v. Rutherford,* 645 F.2d 880, 885 (10th Cir.1981) ("operational efficiency objections to speech must be real and important before they can serve as a basis for discipline or discharge of a public employee.").

In sum, there is simply insufficient evidence that the *letter itself* interfered with effective functioning of the police department. Rather, the evidence supports the conclusion that Wulf's letter was seeking to rectify malfunctions already present in the department. Additionally, there is no evidence that LaMunyon would ever have realized the impropriety in his use of departmental funds to mail Christian Police Officers' Association bulletins without Wulf's letter. *See Brawner v. City of Richardson, Texas,* 855 F.2d at 192; *Marohnic v. Walker,* 800 F.2d 613, 616 (6th Cir.1986).

Neither Wulf's position as a police officer, nor the heightened interest of a police department in maintaining discipline persuade us that the balance should tip in favor of the department. We therefore hold that Wulf's interest in writing the letter outweighed the department's interest in terminating him because of it.

Having concluded that Wulf's letter was protected speech, we now review the district court's factual conclusion that Wulf's letter was a substantial or motivating factor in his termination. *See Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50

L.Ed.2d 471 (1977). In resolving this issue, we must distinguish between LaMunyon and Denton.

■ While LaMunyon testified that the decision to terminate Wulf was based solely on his insubordination in refusing to answer questions at the Internal Affairs hearing, there is ample evidence in the record that LaMunyon's motivation for firing Wulf was the letter that Wulf wrote to the Attorney General. LaMunyon testified to his anger and displeasure when he learned of the letter. Although LaMunyon denied making the statement, there was testimony that, when he learned of Wulf's letter, LaMunyon said "If that's the case, I'll have his ass." There was also testimony, particularly from Nelson Schock, that Wulf was going to be fired even before he went into the Internal Affairs interview. We agree with the district court's statement that "[a] fair reading of the interview ... indicates that Wulf remained willing to answer questions if he could have his attorney present." *Wulf,* 644 F.Supp. at 1225. LaMunyon's refusal to permit Wulf to have an attorney present is suspect in view of the testimony of Lieutenant Ken Adamson that he had his attorney present during an Internal Affairs interview. Additionally, no other officer was fired for a first act of insubordination in the four years prior to Wulf's termination, which suggests that LaMunyon's recommendation to fire Wulf was pretextual. The Police Department Rules and Regulations do not list termination among the permissible penalties for a first act of insubordination. Those facts were either known or should have been known to LaMunyon. We therefore affirm the district court's conclusion that Wulf's letter was a substantial or motivating factor in LaMunyon's recommendation. We reach a different conclusion with regard to Denton.

■ Denton, like LaMunyon, testified that his decision to terminate Wulf was based upon his conclusion that Wulf had been insubordinate. That decision, in turn,

---

**27.** Of course, there may be cases "where the circumstances and content of the speech make unequivocal its harmful effects." *American*

*Postal Workers Union,* 830 F.2d at 304 n. 12. That is not the case here.

was at least partially based upon the recommendation of two separate persons or bodies—Rothe and the Personnel Advisory Board—each of which conducted a hearing and some kind of investigation, and concluded that Wulf had indeed been insubordinate. In addition, Denton testified that he had directed LaMunyon to investigate the validity of the accusations contained in Wulf's letter and that, at some point prior to his final decision to terminate Wulf, he had been told by LaMunyon that LaMunyon and two separate law enforcement agencies had investigated the allegations and found them groundless. That statement was not, in fact, entirely accurate.[28] Similarly, Denton directed LaMunyon to consult with the City's legal department and to check the applicable City rules and regulations to determine if Wulf's termination was proper. Again, he was told by LaMunyon that the legal staff had found no problems with the termination, and that the applicable rules and regulations had been complied with.

On the other hand, we note that Denton's investigation into the circumstances surrounding Wulf's termination was not a model of thoroughness. He knew the nature of the allegations in Wulf's letter and therefore knew that Wulf had alleged serious misconduct by LaMunyon. Yet he made no effort to independently confirm the status of any investigation into Wulf's letter, but instead relied in part upon LaMunyon—the object of Wulf's criticism—and newspapers. He was deferential to LaMunyon's recommendation that Wulf be terminated, yet he arguably should have been suspicious of, or at least thoroughly questioned, LaMunyon's recommendation in light of the fact that LaMunyon was the focus of Wulf's letter. He also made no effort to check on Wulf's employment history or to check whether termination, rather than some lesser penalty, was more appropriate. Additionally, we are aware that perfunctory consultation with counsel should not automatically insulate government officials from liability. Nonetheless, all of these omissions and oversights amount at most to simple negligence, which cannot form the basis for a First Amendment claim.

Considering the evidence as a whole, we cannot say that Denton made the decision to terminate Wulf for the same impermissible reasons as LaMunyon. Thus, Wulf's protected speech was not a substantial or motivating factor in *Denton*'s decision and the district court clearly erred in so holding. Wulf has therefore failed to establish a First Amendment claim against Denton.

Finally, we consider whether LaMunyon has met his burden of proving that Wulf would have been fired anyway.[29] The district court held he did not and we affirm. Wulf's personnel record reveals no problems with his performance as a police officer. We agree with the district court that defendants presented no credible evidence that Wulf would have been fired despite the letter. We therefore hold that Wulf's First Amendment rights were violated when he was terminated for writing the letter to the Attorney General.

## II. Personal Liability of LaMunyon and Denton

Defendants LaMunyon and Denton were sued both in their official capacities and in their personal capacities.[30] The dis-

---

**28.** For example, LaMunyon testified that he received a written opinion from the City's Legal Department late in the evening of April 21 or early in the morning of April 22, stating that it was improper to use departmental funds for the Christian Officers' mailing.

**29.** The district court held that Wulf established a First Amendment cause of action against *all* the defendants, and accordingly considered whether all defendants met their burden of proof. As previously indicated, we have held that Wulf failed to establish a First Amendment violation by Denton because he failed to prove that his letter was a substantial or motivating factor in Denton's decision. Therefore, Denton need not prove that he would have fired Wulf anyway. As more fully explained *infra*, Denton's non-liability relieves the City of liability as well.

**30.** As the Supreme Court has made clear, official capacity suits are simply another way of suing the municipality itself. *See Kentucky v. Graham*, 473 U.S. 159, 163, 105 S.Ct. 3099, 3104, 87 L.Ed.2d 114 (1985).

trict court found their personal liability was established.[31] In view of our holding that Wulf's protected speech was not a substantial or motivating factor in Denton's decision to fire him, Denton is relieved of any personal liability. With regard to LaMunyon, we have held that Wulf's protected speech *was* a substantial or motivating factor in his recommendation to terminate Wulf. We accordingly must consider whether he can be personally liable for the damages flowing from Wulf's formal termination by Denton. We hold that he can.

As we discuss more fully *infra,* only Denton had the actual authority to fire Wulf. LaMunyon's authority was technically limited to suspending Wulf or recommending his termination. To hold LaMunyon personally liable for Wulf's termination, there must be a causal connection between his recommendation and Wulf's termination. *See Neubauer v. City of McAllen,* 766 F.2d 1567, 1577 n. 11 (5th Cir.1985) (and cases cited therein); *see also Kentucky v. Graham,* 473 U.S. 159, 166, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985) ("to establish *personal* liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right."). We think the evidence supports the conclusion that LaMunyon "caused" Wulf's termination. No one disputes that Denton, as well as Rothe and the Personnel Advisory Board, listened to LaMunyon's recommendation and, to some extent, relied on that recommendation. LaMunyon was sufficiently involved in the entire decision-making process that we can affirm the district court's finding of personal liability. *See Conner v. Reinhard,* 847 F.2d 384, 397 (7th Cir.) ("The requisite causal connection is satisfied if the defendant set in motion a series of events that the defendant knew or should reasonably have known would cause others to deprive the plaintiff of her constitutional rights."), *cert. denied,* —— U.S. ——, 109 S.Ct. 147, 102 L.Ed.2d 118 (1988);

*Miller v. City of Mission, Kansas,* 705 F.2d 368, 375 (10th Cir.1983).

Having concluded that LaMunyon is personally liable, we now consider whether qualified immunity shields him.

### III. Qualified Immunity

▪ Under *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 27, 73 L.Ed.2d 396 (1982) "government officials performing discretionary functions [are generally shielded] ... from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." As we noted in *Melton,* 879 F.2d at 727, "[t]he key to the inquiry is the 'objective reasonableness' of the official's conduct in light of the legal rules that were 'clearly established' at the time the action was taken."

Determining whether the law was "clearly established" can be particularly difficult in the context of First Amendment claims. This is so because, as the Supreme Court in *Connick* specifically acknowledged, the inquiry into whether public employee speech may properly serve as the basis for an adverse employment decision is necessarily factual and must be resolved case by case, without the benefit of "a general standard against which all such statements may be judged." *Connick,* 461 U.S. at 154, 103 S.Ct. at 1694.

In *Melton,* we stated:
"A simple black letter rule is not possible. What is clear is that *Harlow* places the presumption in favor of immunity for police officials acting in their individual capacities. *Harlow* is intended as a shield against liability but cannot become an insuperable barrier; therefore, public officials lose immunity in the face of clearly established law. However, *because a rule of law determined by a balancing of interests is inevitably difficult to clearly anticipate, it follows that where Pickering balancing is re-*

---

**31.** The district court based Denton's personal liability on his ratification, on three occasions, of LaMunyon's decision to fire Wulf, while failing "to require meaningful fact-finding, even

though he had been apprised of the allegations in Wulf's letter to the Attorney General." *Wulf,* 644 F.Supp. at 1226.

*quired, the law is less likely to be well established than in other cases. We believe that except for case-by-case analysis and application, the rule cannot be better stated than in Harlow itself with careful consideration of its underlying principles.*"

*Id.* at 729 (emphasis added) (footnote omitted). We went on to note that in some situations, particularly "where supervisors, in a reasonable and good-faith exercise of their duties, discipline employees without the direction that would come through analogous cases," a determination that the law is "clearly established" will be precluded by the "fact-specific nature of the *Pickering* balancing." *Id.* at 729. We further cautioned if "courts in analogous but not necessarily factually identical cases have struck the necessary balance, government officials will be deemed 'on notice' that their actions will be measured according to clearly established law and qualified immunity may not be available to them." *Id.* at 729 n. 36; *but see Dartland v. Metropolitan Dade County,* 866 F.2d 1321, 1323 (11th Cir.1989) ("Because no bright-line standard puts the reasonable public official on notice of a constitutional violation, the employer is entitled to immunity except in the extraordinary case where *Pickering* balancing would lead to the inevitable conclusion that the discharge of the employee was unlawful.").[32]

Applying those principles to this case, we must determine whether, at the time the relevant events occurred, it was "sufficiently clear that [LaMunyon] should have been reasonably on notice" that the City's interest in terminating Wulf because of his letter would be outweighed by Wulf's interest in writing the letter. *Melton,* 879 F.2d at 729.[33] The parties direct us to no cases which are analogous. Defendants assert there are none.

The right generally to make statements critical of public officials has been long recognized as a protected First Amendment right. *See Rakovich v. Wade,* 850 F.2d 1180, 1211 (7th Cir.) ("[I]t is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions.") (quoting *Bridges v. California,* 314 U.S. 252, 272, 62 S.Ct. 190, 198, 86 L.Ed. 192 (1941)), *cert. denied,* —— U.S. ——, 109 S.Ct. 497, 102 L.Ed.2d 534 (1988); *see also New York Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964). That right applies to policemen no less than to other public employees. *See, e.g., Garrity v. New Jersey,* 385 U.S. 493, 500, 87 S.Ct. 616, 620, 17 L.Ed.2d 562 (1967) ("[P]olicemen, like teachers and lawyers, are not relegated to a watered-down version of constitutional rights."); *Wilson v. Taylor,* 658 F.2d 1021, 1027 (5th Cir. Unit B 1981); *Hanneman v. Breier,* 528 F.2d 750, 754 (7th Cir.1976); *Muller v. Conlisk,* 429 F.2d 901, 904 (7th Cir.1970). However, it has also been recognized for some time

---

**32.** In *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987), the Supreme Court explained "clearly established" as follows:

"The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of preexisting law the unlawfulness must be apparent." (citations omitted).

**33.** The district court phrased the inquiry too broadly:

"The laws protecting the First Amendment rights of public employees have been clearly established for years. A reasonable government official would have known that to punish an employee under the circumstances in

this lawsuit would violate the employee's First Amendment rights."

*Wulf,* 644 F.Supp. at 1226. The district court failed to adequately relate the qualified immunity inquiry to the particular facts of the case. *See Dartland v. Metropolitan Dade County,* 866 F.2d at 1322–23 ("[Plaintiff] cannot persuade the court that the law is clearly established by making general, conclusory allegations of a constitutional violation or by stating broad legal truisms."); *Barts v. Joyner,* 865 F.2d 1187, 1190 (11th Cir.1989) ("Plaintiff cannot discharge her burden [of proving the law was clearly established] by making general, conclusory allegations of some constitutional violation or by stating broad legal truisms. Rather, as the courts have plainly stated, plaintiffs must prove the existence of a clear, factually-defined, well recognized right of which a reasonable police officer should have known.").

that "the state's interest in regulating its police force can be exceptionally compelling." *Waters v. Chaffin*, 684 F.2d at 836; *see also Barrett v. Thomas*, 649 F.2d 1193, 1198 (5th Cir. Unit A 1981), *cert. denied*, 456 U.S. 925, 102 S.Ct. 1969, 72 L.Ed.2d 440 (1982) and *cert. denied*, 456 U.S. 936, 102 S.Ct. 1992, 72 L.Ed.2d 455 (1982); *Bickel v. Burkhart*, 632 F.2d 1251, 1257 (5th Cir. Unit A 1980); *Kannisto v. City and County of San Francisco*, 541 F.2d 841, 843 (9th Cir.1976), *cert. denied*, 430 U.S. 931, 97 S.Ct. 1552, 51 L.Ed.2d 775 (1977); *Muller v. Conlisk*, 429 F.2d 901, 904 (7th Cir.1970); *see generally* Finck, Nonpartisan Speech in the Police Department: The Aftermath of *Pickering*, 7 Hastings Const. L.Q. 1001 (1980).

Wulf cites *Fujiwara v. Clark*, 703 F.2d 357 (9th Cir.1983) for the proposition that the protected nature of Wulf's speech was clearly established. That case is not sufficiently analogous to this one, in part because it does not involve a police department and therefore does not involve the heightened interest in maintaining discipline.

We have found one case which has some similarities to our case. In *Hanneman v. Breier*, 528 F.2d 750, police officers, members of the Milwaukee Professional Policemen's Protective Association ("MPPPA") alleged that the Chief of Police violated their First Amendment rights when he disciplined them under a police department rule prohibiting the disclosure of confidential police information. The discipline arose out of an investigation into the political activities of the MPPPA. The plaintiffs thereafter wrote a letter, on behalf of the MPPPA, to the City Mayor, the City Council, the City labor negotiator, and the state labor board, protesting the investigation and alleging, untruthfully in fact, that the police chief was "acting for improper antiunion motives." *Id.* at 755. The plaintiffs were subsequently found guilty of violating a departmental rule prohibiting the disclosure of "official business of the Department." *Id.* at 752. They challenged as unconstitutional the application of the confidentiality rule.

In finding that the imposition of punishment in response to the letter violated the plaintiffs' First Amendment rights, the court noted that "[a]ny unique aspect of police department employment is to be considered as but one element in the balancing of interests in an individual case." *Id.* 754; *see also Tygrett v. Barry*, 627 F.2d 1279, 1283 (D.C.Cir.1980). After balancing the interests at stake, the court concluded that the plaintiffs' interest in writing the letter, which revealed nothing which had not already been made public in newspaper stories about the investigation, outweighed the department's interest in applying its confidentiality rule to plaintiffs. The court stated:

"Once the matter was placed in the public eye, plaintiffs, as officers of the certified collective bargaining representative of nonsupervisory policemen, had a legitimate interest in bringing any improper antiunion conduct by the chief of police in connection with the now-publicized investigation to the attention of influential government officials outside the police department. The finding by the district court that the investigation was not motivated by anti-union animus does not negate plaintiff's interest in soliciting outside support which they believed to be necessary at the time."

*Hanneman*, 528 F.2d at 755 (footnotes omitted). Thus, *Hanneman* would suggest that a reasonable police chief should have known that at least Wulf's allegations of anti-union animus, if not the other allegations, could not lawfully form the basis for discipline in the circumstances of this case. *See also Conner v. Reinhard*, 847 F.2d 384, 390–93 (7th Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 147, 102 L.Ed.2d 118 (1988); *Williams v. Bd. of Regents*, 629 F.2d 993, 1003 (5th Cir.1980), *cert. denied*, 452 U.S. 926, 101 S.Ct. 3063, 69 L.Ed.2d 428 (1981); *Gasparinetti v. Kerr*, 568 F.2d 311, 317 n. 18 (3d Cir.1977) ("The public interest in free and open debate about its police department's operations is vital.... Moreover, there is an especially strong public interest in having a police union leadership who will speak openly and candidly about their members' grievances

and demands."), *cert. denied,* 436 U.S. 903, 98 S.Ct. 2232, 56 L.Ed.2d 401 (1978).

While we regard this as a very close case, we conclude that a reasonable police chief should have been on notice that it would be a violation of the First Amendment to terminate a police officer who wrote a letter alleging, *inter alia,* anti-union animus on the part of the police chief, particularly where the letter caused no significant disruption of police department operations.

## IV. Punitive Damages

Because we have concluded that LaMunyon's personal liability was correctly established, and he is shielded by no qualified immunity, we must consider the propriety of the $50,000 punitive damage award assessed against LaMunyon, which defendants appeal.

■ "Federal standards govern the imposition of punitive damages in federal civil rights cases." *Jackson v. Pool Mtge. Co.,* 868 F.2d 1178, 1181 (10th Cir.1989); *Garrick v. City and County of Denver,* 652 F.2d 969, 971 (10th Cir.1981). While the trier of fact has the discretion to determine the appropriate amount of punitive damages, the sufficiency of the evidence supporting such an award is a legal question. *Jackson,* 868 F.2d at 1182; *see also Miller v. Cudahy Co.,* 858 F.2d 1449, 1457 (10th Cir.1988).

As the district court correctly noted, punitive damages are appropriate in a section 1983 case "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade,* 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983); *Wren v. Spurlock,* 798 F.2d 1313, 1322 (10th Cir.1986); *see also Melton,* 879 F.2d at 733. The considerations for assessing punitive damages include "an evaluation of the nature of the conduct in question, the wisdom of some form of pecuniary punishment, and the advisability of a deterrent." *Miller v. City of Mission, Kan.,* 705 F.2d 368, 377 (10th Cir.1983) (quoting *Busche v. Burkee,* 649 F.2d 509,

520 (7th Cir.1981)). We reverse the award of punitive damages.

■ We have concluded that LaMunyon did indeed violate Wulf's constitutional rights because he recommended Wulf's termination on the basis of Wulf's protected speech. Yet not every intentional violation of a plaintiff's constitutional rights subjects a defendant to punitive damages. *See Melton,* 879 F.2d at 733 ("Just because public officials make mistakes in judgment in the performance of their duties sufficient to subject them to liability for actual damages does not automatically create a basis for a punitive award."). There was evidence that LaMunyon may have thought it was legitimate for him to terminate Wulf because of concerns that Wulf was undermining the efficiency of the police department's operations. It does not matter that we have concluded that his perception of disruption was *objectively* unreasonable, because an award of punitive damages requires an assessment of his *subjective* state of mind. We accordingly find that insufficient evidence supports the district court's award of punitive damages against LaMunyon. LaMunyon's personal liability for Wulf's compensatory damages serves as an adequate pecuniary punishment as well as a deterrent to future misconduct.

## V. Liability of City of Wichita

■ The district court held that the City was liable because both Denton and LaMunyon were "the City's official policymakers" and their decisions "formed the basis of the constitutional tort." Accordingly, the court found the City's liability established under *Monell v. Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). We hold that the district court erred in concluding that LaMunyon was an official policymaker whose actions can bind the City. Because we have held that Denton, who was the official policymaker, did not violate Wulf's constitutional rights when he decided to terminate him, we find no liability on the part of the City.

As a plurality of the Supreme Court made clear in its most recent case defining

the contours of municipal liability, *City of St. Louis v. Praprotnik*, 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988), "only those municipal officials who have 'final policymaking authority' may by their actions subject the government to § 1983 liability." *Id.* at 924. State law, as reflected in statutes, ordinances, regulations, city charters or other similar compilations, determines who has "final policymaking authority." *See also Jett v. Dallas Independent School Dist.*, — U.S. —, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989),

We noted in *Melton* that "the plurality in *Praprotnik* identified two situations where municipal liability nevertheless could be found even though the action is taken by an individual other than the 'final policymaker.'" *Melton*, 879 F.2d at 724. "[E]gregious attempts by local government to insulate themselves from liability for unconstitutional policies are precluded ... [if a plaintiff proves] the existence of a widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a "custom or usage" with the force of law.'" *Praprotnik*, 108 S.Ct. at 925–26 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–68, 90 S.Ct. 1598, 1613–14, 26 L.Ed.2d 142 (1970)). Additionally, "[i]f the authorized policymakers approve a subordinate's decision *and the basis for it*, their ratification would be chargeable to the municipality because their decision is final." *Id.* 108 S.Ct. at 926 (emphasis added). In *Melton*, we found that the City Manager had ratified, under *Praprotnik*, the unlawful termination of a police officer, thus establishing the liability of Oklahoma City. In so doing, we took judicial notice of the City Charter, which "makes clear that the City Manager is the 'final policymaking authority' over employment decisions affecting City personnel." *Melton*, 879 F.2d at 724.

In this case, we do not have in the record official copies of the City Charter or the relevant ordinances or procedure manuals for the City of Wichita.[34] Nonetheless, the evidence we do have in the form of Denton's testimony as to his duties and quotations from the ordinances governing the City indicates that Denton is the only person with any claim of having "final policymaking authority" over employment decisions. Despite LaMunyon's testimony that he had been given "carte blanche" authority to hire and fire police department employees, and that in Wulf's case he, in practical effect, "fired" Wulf on the morning of April 21, the evidence in this case does not support a finding of municipal liability based on LaMunyon's actions. That evidence supports neither a "widespread practice ... [constituting] a 'custom or usage'" nor the kind of "ratification" which, under *Praprotnik*, may result in municipal liability. As was made clear in this case, it was Denton, not LaMunyon, who made the actual and ultimate decision to terminate Wulf, albeit with LaMunyon's initial recommendation that he do so. He did not completely delegate to LaMunyon the authority to make employment decisions. Yet we have concluded that Denton's decision was not based on Wulf's protected speech and therefore did not amount to approval of the impermissible basis (i.e. writing the letter) for LaMunyon's recommendation. Thus, because LaMunyon is not an official policymaker and because Denton did not ratify, under *Praprotnik*, LaMunyon's unlawful decision, the City is not liable for Wulf's termination.

We recognize that it may seem anomalous to hold a subordinate City official such as LaMunyon liable for damages flowing from an unlawful termination which he lacked the actual authority to order, yet relieve the City and City Manager of liability because they, in contrast to the subordinate, did not act with the requisite impermissible motive. Such a result is, in our view, compelled by two lines of Supreme Court authority. First, the Court has

---

**34.** The parties briefed this appeal prior to the issuance of the *Praprotnik* decision, and therefore have not argued this case with the benefit of *Praprotnik*'s explicit directive, albeit in a plurality opinion, to look at state law to determine where policymaking authority resides. The district court also did not have the benefit of *Praprotnik* when it rendered its decision.

steadfastly refused to premise municipal liability on the basis of respondeat superior. *See Jett v. Dallas Independent School Dist.,* —— U.S. ——, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989); *Praprotnik,* 108 S.Ct. at 923; *Monell,* 436 U.S. at 694, 98 S.Ct. 20. Second, *Praprotnik* directs us to look only at where statutory policymaking authority lies, rather than where *de facto* authority may reside. Thus, a subordinate who wields considerable *actual* power, yet who lacks the legal power to terminate an employee, may, in the circumstances of this case, be liable, while the City is not.

This result is not so anomalous when considered in light of the following hypothetical: A subordinate city official completely falsely states to his superior that an employee engaged in misconduct. The superior, through no negligence of his own, is unaware of the falsity of the statements about the employee. The superior fires the employee, believing, falsely in fact, that good grounds exist therefore. In such a situation, it is inconceivable that the superior or the City would be liable. That hypothetical is not, however, far removed form the case before us. It illustrates the propriety of the result we reach.

## VI. Liberty Interest

The district court held that "Wulf's termination, coupled with LaMunyon's disparaging, false and stigmatizing statements to Wulf's prospective employers, which damaged Wulf's ability to obtain other employment, establishes a claim of liberty deprivation." *Wulf,* 644 F.Supp. at 1222. We disagree.

This court has stated:

"[F]or an employee to make a successful liberty deprivation claim she must show that her dismissal resulted in the *publi-*

35. As we stated in *McGhee:*
"Typically, when one's liberty interest is allegedly infringed upon by a discharge from employment, the termination or non-renewal will either explicitly state the stigmatizing factors or implicitly ratify some other stigmatizing allegations. Thus, the dismissal will either cause or contribute to the alleged defamation."

*cation* of information which was *false* and *stigmatizing*—information which had the general effect of *curtailing her future freedom of choice or action."* *Asbill v. Housing Auth. of Choctaw Nation,* 726 F.2d 1499, 1503 (10th Cir.1984) (emphasis original) (footnotes omitted); *see also Koerpel v. Heckler,* 797 F.2d 858, 865 (10th Cir.1986). As we have also clearly stated, reputational injury is insufficient standing alone—"plaintiff's alleged reputational damage must be entangled with some other 'tangible interests such as employment.'" *McGhee v. Draper,* 639 F.2d 639, 643 (10th Cir.1981). The Supreme Court has stated that the defamation must occur "in the course of the termination of employment." *Paul v. Davis,* 424 U.S. 693, 710, 96 S.Ct. 1155, 1165, 47 L.Ed.2d 405 (1976).[35]

The statements which allegedly stigmatized Wulf were LaMunyon's statement made the day before Wulf was fired and quoted in a newspaper the day of Wulf's termination that Wulf's allegations were "not worth a damn," and the statements allegedly made several months after Wulf's termination to the City Administrator of Park City, to the effect that Wulf "did not have his facts together" and that LaMunyon and Wulf could not have a good working relationship with each other. The latter statements were not made "in the course of" Wulf's termination and thus cannot form the basis for a claimed deprivation of a liberty interest. *See Paul v. Davis,* 424 U.S. at 710, 96 S.Ct. at 1165; *Ewers v. Bd. of County Comm'rs,* 802 F.2d 1242, 1248 (10th Cir.1986), *reh'g granted on other grounds,* 813 F.2d 1583 (1987), *cert. denied,* 484 U.S. 1008, 108 S.Ct. 704, 98 L.Ed.2d 655 (1988). Thus, we need not reach the question of whether they were false and stigmatizing.

*McGhee v. Draper,* 639 F.2d at 643; *see also Ewers v. Bd. of Cty. Commissioners,* 802 F.2d 1242, 1248 (10th Cir.1986), *reh'g granted on other grounds,* 813 F.2d 1583 (1987), *cert. denied,* 484 U.S. 1008, 108 S.Ct. 704, 98 L.Ed.2d 655 (1988); *Harris v. Blake,* 798 F.2d 419, 422 n. 2 (10th Cir.1986), *cert. denied,* 479 U.S. 1033, 107 S.Ct. 882, 93 L.Ed.2d 836 (1987).

■ With regard to the former statement, that Wulf's allegations were "not worth a damn," Wulf asserts that the statement suggests that Wulf is a liar. We agree with Wulf that the statement is false—while not all of Wulf's allegations were sufficient to open LaMunyon to criminal charges, we have held that they were of public concern and protected under the First Amendment. Thus, they were worth something. We do not agree, however, with Wulf's contention that the statement was stigmatizing.

This court has stated that "[t]he concept of liberty recognizes two particular interests of a public employee: 1) the protection of his good name, reputation, honor, and integrity, and 2) his freedom to take advantage of other employment opportunities." *Conaway v. Smith*, 853 F.2d at 794.[36] We find neither of these interests implicated by LaMunyon's statement. We find the statement to be ambiguous, susceptible to a number of different interpretations. It is not tantamount to calling Wulf a liar; it is simply LaMunyon's personal views as to the weight to be given Wulf's allegations. It indicates a disagreement between Wulf and LaMunyon concerning the worth of Wulf's allegations, but that is not, in itself, stigmatizing. Additionally, there was no evidence that that statement contributed to Wulf's failure to get other employment. We cannot say that such an ambiguous statement implicated any liberty interest of Wulf's.

## VII. Damages

Defendants challenge the amount of damages awarded Wulf, arguing that factual and legal errors caused the figure to be too high. We agree in part and remand for a recalculation of damages.

The district court awarded Wulf $242,-465.95 for "back pay, loss of use of income and taxes." *Wulf*, 644 F.Supp. at 1226. Defendants argue that they only stipulated to a total of $140,559.97 for gross back pay, health and life insurance, and uniform allowance, covering the period from April 20, 1981 until February 22, 1986, Wulf's 20-year anniversary on the job and the day his pension vested. The remaining $101,-905.98 reflects the district court's award of $21,084 for loss of the use of the income, which defendants do not challenge, and a 50% enhancement figure of $80,821.97 for taxes due on the lump sum award, which defendants do challenge.

Defendants initially argue that the gross back pay award is too high because there are no deductions for Wulf's earnings during the relevant time period as reflected in Wulf's income tax returns for the years in question.

■ "Back pay awards seek to make whole discharged employees for their lost wages and not for extra expenses." *Equal Employment Opportunity Comm'n v. Sandia Corp.*, 639 F.2d 600, 626 (10th Cir. 1980); *see also Blum v. Witco Chemical Corp.*, 829 F.2d 367, 373 (3d Cir.1987) ("We caution ... that such [lost pension] benefits may not be available where an award would make a plaintiff more than whole.") While we agree that the trial court has discretion to utilize a variety of remedies, including an award of damages denominated as back pay, to make a plaintiff whole, we believe it is appropriate in this case to direct the district court to offset from Wulf's award amounts he earned from other employment during the relevant period. *See Sandia Corp.*, 639 F.2d 600

**36.** As Judge McKay noted in his dissenting opinion in *Garcia v. Bd. of Educ.*, 777 F.2d 1403, 1419 (10th Cir.1985), *cert. denied*, 479 U.S. 814, 107 S.Ct. 66, 93 L.Ed.2d 24 (1986), "[t]his court, and those in other circuits, has been struggling to define what types of charges are sufficiently stigmatizing to invoke due process" (footnote omitted). While charges of immorality or dishonesty are clearly stigmatizing, courts have not agreed on whether other allegations of, for example, incompetence or poor work performance, are stigmatizing. *See id.* and n. 8 (McKay,

Judge, dissenting in part and concurring in part); *see also Conaway v. Smith*, 853 F.2d at 794 ("The reasons for [plaintiff's] discharge, neglect of duties and insubordination, even when considered false, do not call into question his good name, reputation, honor, or integrity. In comparison, a liberty interest might be implicated by charges of 'dishonesty or immorality' because such charge might seriously damage his standing and association in the community.") (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 573, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)).

(court affirmed district court order reducing back pay awards by amounts received from other employment); *see also Gutzwiller v. Fenik*, 860 F.2d 1317, 1333 (6th Cir. 1988) (back pay award reduced by amounts plaintiff earned, "or with reasonable diligence could have earned" after denial of tenure); *Blum*, 829 F.2d at 374 ("A plaintiff, of course, has a duty to mitigate damages and his new salary will be deducted from the old to avoid a windfall award."); *Haskins v. City of Boaz*, 822 F.2d 1014, 1015 (11th Cir.1987) (per curiam) (court affirmed award of front pay of "the difference between the salary he would have received had he been properly reinstated and the salary he was earning at a police job he had located ..."); *Barnett v. Housing Auth.*, 707 F.2d 1571, 1579 (11th Cir. 1983) (court affirmed computation of back pay "based on the evidence establishing the period [plaintiff] remained unemployed and the difference between his salary with [defendant] and the compensation he received from later employment.").[37] There was no evidence that Wulf would have established his private investigating business had he not been terminated from employment as a police officer, so it is fair to reduce his back pay award by the amounts earned in that business.

■ Defendants next challenge the tax enhancement figure, arguing that the district court failed to explain its choice of a 50% enhancement figure and that a lump sum award for back pay in a section 1983 First Amendment case is not taxable.

We first address the contention that the award is not taxable. Defendants rely on *Bent v. Commissioner*, 835 F.2d 67 (3d Cir.1987) for the proposition that a lump sum award for back pay in a First Amendment case is not taxable. Thus, defendants argue any tax adjustment requires a reduction of the lump sum figure "so as to equate the after-tax values of the tax-free lump sum and the taxable wages." Brief of Appellants at 42.

In *Bent*, the plaintiff sued the school board after he was discharged, claiming that his discharge violated his constitutional rights, including his right to free speech. The court determined that his discharge had violated his First Amendment rights, but before a hearing on damages could be held, the parties settled and the defendants' insurance carrier paid the plaintiff $24,000, "computed in part by the inclusion of lost wages as suggested by the taxpayer." *Id.* at 69. When the plaintiff failed to report the $24,000 as income, the Commissioner of the Internal Revenue assessed a deficiency, which the plaintiff challenged. The Tax Court was thus faced with the question of whether all or a part of the $24,000 received by the plaintiff because of the violation of his First Amendment rights was taxable. The Tax Court concluded that the settlement was excludable from the plaintiff's taxable income, and the Third Circuit affirmed.

As the *Bent* court noted, section 61(a) of the Internal Revenue Code provides that gross income included "all income from whatever source derived." 26 U.S.C. § 61(a) (1988). One exception to that general rule is contained in section 104(a)(2), which provides in pertinent part:

"gross income does not include ... (2) the amount of any damages received (whether by suit or agreement and whether as lump sums or as periodic payments) on account of personal injuries or sickness."

*Id.* at § 104(a)(2).[38]

The Third Circuit examined the nature of a First Amendment action and concluded that it is a "tort type right enforceable under 42 U.S.C. § 1983." *Bent*, 835 F.2d at 69. *See also Carey v. Piphus*, 435 U.S. 247, 258, 98 S.Ct. 1042, 1049, 55 L.Ed.2d 252 (1978); *Monroe v. Pape*, 365 U.S. 167, 187, 81 S.Ct. 473, 484, 5 L.Ed.2d 492 (1961).

---

**37.** "The relevant time period for calculating an award of back pay begins with wrongful termination and ends at the time of trial." *Blum v. Witco Chemical Corp.*, 829 F.2d at 373.

**38.** Treasury Regulation 1.104–1(c) defines the term "damages received (whether by suit or agreement)" as "an amount received (other than workmen's compensation) through prosecution of a legal suit or action based upon tort or tort-type rights." 26 C.F.R. § 1–104–1(c) (1988).

The court then considered whether the plaintiff's damages were received "on account of personal injuries." The Commissioner argued that "since the settlement admittedly included a sum based on the taxpayer's lost wages, that sum represented compensation for lost wages which was not excludable from gross income under section 104(a)(2)." *Bent*, 835 F.2d at 70. The court rejected that argument, stating:

"[A]n award of damages for the violation of a constitutional right may be measured in whole or in part by the amount of lost wages. This is possible where, as here, the injury being compensated for is solely the violation of the taxpayer's First Amendment right of free speech, *his direct contract claim for lost wages having been decided against him by the court. The amount of his lost wages may be used in computing the amount of damages awarded for the constitutional violation even though an award based directly on the claim of lost wages has been rejected by the court.*"

*Id.* (emphasis added).[39]

More recently, the Fourth Circuit tangled with a similar issue in a case involving the taxability of an award of back pay under the Equal Pay Act and Title VII. *Thompson v. Commissioner*, 866 F.2d 709 (4th Cir.1989). The plaintiff in that case, who was paid less than her male counterparts, received an award of damages for back pay under the two statutory schemes, and an award of liquidated damages under the Equal Pay Act. The court held that the award of back pay *was* includable in the plaintiff's gross income, whereas the award of liquidated damages was not. In so holding, the court examined the nature of the two different types of awards. With regard to back pay the court stated:

"[T]he tax court correctly recognized that 'an amount paid as back pay under [the Equal Pay Act] is more in the nature of a payment for a contract violation than for a tort-type right.' Back pay under the Equal Pay Act is 'deemed to be unpaid minimum wages or unpaid overtime compensation.' 29 U.S.C.A. § 206(d)(3). [The plaintiff] performed essentially the same work as her male co-workers for which she should have received equal pay. The back pay award was simply recovery for earned, but unpaid, wages which distinguishes her award of back pay from awards for lost wages or lost income in traditional personal injury/tort actions. She received compensation for services rendered whereas a tort plaintiff receives compensation for the inability to earn an income due to the tortious action of a defendant."

*Thompson*, 866 F.2d at 712 (citations omitted). By contrast, the court characterized the "liquidated damages award [as] ... not earned income. Rather it served both as a deterrent to ensure compliance with the Act, and as 'compensation for the retention of a workman's pay which might result in damages too obscure and difficult of proof for estimate other than by liquidated damages.'" *Id.* (quoting *Brooklyn Savings Bank v. O'Neil*, 324 U.S. 697, 707, 710, 65 S.Ct. 895, 902, 903, 89 L.Ed. 1296 (1945)). The court accordingly found the back pay award was includable in gross income, whereas the liquidated damages award, as "compensation received through a tort or tort-type action for personal injuries," was not. *Thompson*, 866 F.2d at 712.

---

**39.** The Ninth Circuit explored the rationale behind the exclusion of awards for personal injuries from gross income as follows:

"An individual who wins a personal injury suit is usually given a lump-sum award that includes an amount for items that ordinarily would be taxable, such as lost income. Although it might be logical to allocate a lump-sum award between its excludable and taxable components, the Commission has long excluded from income the entire monetary judgment. The rationale behind the exclusion of the entire award is apparently a feeling that the injured party, who has suffered enough, should not be further burdened with the practical difficulty of sorting out the taxable and nontaxable components of a lump-sum award."

*Roemer v. Commissioner*, 716 F.2d 693, 696 (9th Cir.1983) (citation omitted). While arguably in this case the district court *did* allocate between the various components of the award, in our view, even the back pay award to Wulf represents damages received "on account of personal injuries."

Considering *Bent* and *Thompson* together, we hold that the damage award representing back pay was not taxable. While arguably it is more clear in this case than in *Bent* that a portion of Wulf's damages award specifically represents back pay, nonetheless the nature of his underlying claim was a tort-type claim—i.e. that the termination of his employment in contravention of the First Amendment violated section 1983. *See Monroe v. Pape*, 365 U.S. 167, 187, 81 S.Ct. 473, 484, 5 L.Ed.2d 492 (1961) (Court noted that section 1983 "should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions."). The award of back pay compensated him for the economic injury resulting from the denial of his constitutional rights. It is still an award of damages "on account of personal injuries," and is therefore not taxable. *See Bent*, 835 F.2d at 71 ("any economic injury proximately resulting, such as loss of wages in this instance, may be compensated for in an award of damages for the personal injuries involved in the denial of the civil right.").[40] We therefore reverse the award of an additional $80,821.97 for taxes due and we need not address how the court arrived at its 50% enhancement figure.

We decline, however, to reduce the award of $161,643.97 at this point to reflect the tax free nature of the award. We direct the district court on remand to consider that fact, however, in determining an appropriate damage amount. *See generally Gulf Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473, 485–88, 101 S.Ct. 2870, 2878–81, 69 L.Ed.2d 784 (1981); *Norfolk & Western Ry. v. Liepelt*, 444 U.S. 490, 100 S.Ct. 755, 62 L.Ed.2d 689 (1980); *In re Air Crash Disaster Near Chicago, Ill., on May 25, 1979*, 803 F.2d 304, 310–12 (7th Cir. 1986).

Next, defendants assert the front pay award of $210,177.00 should be reversed in its entirety, since there is insufficient evidence in the record "to support the trial court's 'implicit' finding ... that Wulf would have remained a policeman another eight years after his pension vested." Brief of Appellants at 42.[41]

An award of front pay, in lieu of reinstatement, is an equitable remedy. The district court accordingly has discretion to decide whether such an award is appropriate. *See Starrett v. Wadley*, 876 F.2d 808 (10th Cir.1989); *Graefenhain v. Pabst Brewing Co.*, 870 F.2d 1198, 1201 (7th Cir.1989). We review the trial judge's award of front pay under an abuse of discretion standard.

We are, of course, unable to tell with certainty whether Wulf would or would not have continued to work as a policeman after his pension vested. Wulf testified that he "possibly" would have. This uncertainty renders a damage award for front pay somewhat speculative. *See Blum*, 829 F.2d at 375 ("the speculative nature of future damages has been cited as a reason for denying such awards."); *Equal Employment Opportunity Comm'n v. Prudential Fed. Sav. and Loan Ass'n*, 763 F.2d 1166, 1173 (10th Cir.1985) ("We recognize that future damages have been criticized as uncertain and speculative."), *cert. denied*, 474 U.S. 946, 106 S.Ct. 312, 88 L.Ed.2d 289 (1985). Defendants, however, are the cause of this uncertainty, and they may not take advantage of an uncertainty that they have themselves created. Furthermore, " '[t]he mere fact that damages may be difficult of computation should not exonerate a wrongdoer from liability.' " *Id.* at 1173 (quoting *Koyen v. Consolidated Edison Co.*, 560 F.Supp. 1161, 1169 (S.D.N.Y.1983)).[42] Since

**40.** LaMunyon, of course, has no responsibility for or obligation to pay Wulf's wages. He *can* be liable for damages, as measured by Wulf's back pay, which flow from a tort he commits.

**41.** No party argues on appeal that reinstatement is appropriate in this case.

**42.** In *Prudential Fed. Sav. and Loan Ass'n:*

"Courts are able to alleviate the uncertainty of future damages by taking into account a discharged employee's duty to mitigate, 'the availability of employment opportunities, the period within which one by reasonable efforts may be re-employed, the employee's work and life expectancy, the discount tables to determine the present value of future damages and

Wulf was 52 years old at the time of his termination, it "does not require unreasonable speculation" to assume that he would have continued to work as a police officer for the City of Wichita had he not been fired. *Blum*, 829 F.2d at 376; *see also Davis v. Combustion Eng'g., Inc.*, 742 F.2d 916, 923 (6th Cir.1984) ("the award of front pay to a discriminatorily discharged 41 year old employee until such time as he qualifies for a pension might be unwarranted. On the other hand, the failure to make such an award for an employee age 63, likewise discriminatorily discharged, might be an abuse of discretion."). Accordingly, we decline to reverse the award of front pay.

The question of whether the front pay award should also be reduced or enhanced (or a combination of the two) to reflect the tax consequences of Wulf's receipt of a lump sum award for front pay was the cause of much consternation and confusion before the district court. The district court ultimately determined that adjustments should be made on both sides of the figure—decreasing the stream of payments by the amount of taxes Wulf would have paid on those payments, and then increasing the final lump sum award to reflect the amount of taxes Wulf would have to pay on the lump sum. It was, however, unable to determine the appropriate figure, and therefore awarded Wulf a non-tax-adjusted figure. Wulf withdrew his request for tax adjustments before the district court, and does not argue for such adjustments on appeal. Defendants simply assert, without supporting authority or specific argument, that "the front pay and back pay awards, rather, should have been *reduced* because they are tax free recoveries." Reply Brief of Appellants at 20. We therefore do not reach the question of whether any such tax adjustments would be necessary, but direct

the district court to consider that issue on remand, in light of our previous discussion.

■■■■■ We do, however, address an issue which defendants do not specifically argue on appeal, but which the district court anticipated. After judgment was entered by the district court, defendants made a Rule 60(b) motion seeking to vacate the front pay award because Wulf applied for and began receiving retirement benefits after the judgment was entered. The district court found that Wulf was essentially forced to apply for retirement benefits because "defendants' appeal has placed him in an untenable financial position." R. Vol. II at Tab. 111 (Opinion and Order, Feb. 11, 1987 at 4). The district court concluded, however, that, if the front pay award is affirmed on appeal, an offset against the front pay award of the amounts paid in retirement benefits might be appropriate. Wulf too conceded the propriety of such an offset. We agree that an offset might be appropriate and direct the district court on remand to consider it. *See Patteson v. Johnson*, 787 F.2d 1245, 1249 (8th Cir.) ("[Plaintiff's] prospective relief should be reduced by any salary or benefits [plaintiff] has accrued in this period, in mitigation."), *cert. denied*, 479 U.S. 828, 107 S.Ct. 109, 93 L.Ed.2d 58 (1986).[43]

■■■■ Finally, defendants argue that the district court's award of $250,000 for Wulf's mental anguish and distress is grossly excessive. Our review of a damage award is constrained by familiar principles. The award itself must be supported by substantial evidence. *See generally Grunenthal v. Long Island R.R.*, 393 U.S. 156, 159–60, 89 S.Ct. 331, 333–34, 21 L.Ed.2d 309 (1968). Additionally, "absent an award so excessive or inadequate as to shock the judicial conscience and raise an irresistible inference that passion, prejudice or another improper cause invaded the trial, the [court's] determination of the

---

other factors that are pertinent on prospective damage awards.' "

763 F.2d at 1173 (quoting *Koyen v. Consolidated Edison Co.*, 560 F.Supp. 1161, 1168–69); *see also Shore v. Federal Express Co.*, 777 F.2d 1155, 1160 (6th Cir.1985).

**43.** We also believe it is equitable to require an offset of the amounts Wulf earned in his private investigation business against his front pay award up until the time he began to draw retirement benefits. Thereafter, the offset of those retirement benefits will be sufficient to prevent Wulf from having a windfall.

amount of damages is inviolate." *Foster v. MCI Telecommunications Corp.*, 773 F.2d 1116, 1121 (10th Cir.1985) (citations omitted).

Wulf's testimony was that his job loss was "very stressful," that he was angry, depressed, scared and frustrated. His wife testified that he was under "tremendous emotional strain" and that they experienced significant financial difficulties. He provided no other testimony or evidence of his emotional or mental suffering. While we agree with defendants that Wulf's testimony and the evidence presented are not the most graphic and detailed display of emotional and mental anguish and distress, we cannot conclude that *some* award for such anguish and distress is unsupported by substantial evidence. We therefore affirm the district court's conclusion that an award for Wulf's mental and emotional pain is appropriate, but we remand for a recalculation of the award, because we hold that $250,000 is excessive.

Defendants assert that the "shock the conscience" standard for reduction of a damage award involves "comparability and proportionality, and ... comparison with the awards in other cases." Brief of Appellants at 46. *See Ramsey v. American Air Filter Co. Inc.*, 772 F.2d 1303, 1313–14 (7th Cir.1985). First, they assert that the award is excessive compared to other cases where a plaintiff received damages for emotional distress occasioned by his discharge in violation of his First Amendment rights. *See, e.g., Sykes v. McDowell*, 786 F.2d 1098 (11th Cir.1986) (deputy sheriff fired because he engaged in political activities received $60,000 for emotional distress); *see also Ramsey*, 772 F.2d at 1313–14 (plaintiff alleging racial discrimination in violation of section 1981 awarded $35,000 for mental distress).

Second, they argue it is excessive compared to other cases where the plaintiff suffered emotional distress of a magnitude comparable to Wulf's. *See, e.g., Wren v. Spurlock*, 798 F.2d 1313 (10th Cir.1986), *cert. denied*, 479 U.S. 1085, 107 S.Ct. 1287, 94 L.Ed.2d 145 (1987) (plaintiff received damages totaling $113,000, a portion of

which represented lost income, where her distress was so severe she was unable to work.); *see also Spence v. Bd. of Educ.*, 806 F.2d 1198, 1200–01 (3d Cir.1986) (no recovery for emotional distress where plaintiff testified she was "depressed and humiliated" by retaliatory transfer); *Ramsey*, 772 F.2d at 1313–14 (and cases cited therein). While we are aware that it is rarely appropriate for an appellate court to reduce the trial court's determination as to the proper amount of damages, and while comparisons with other cases are not dispositive, the award of $250,000 in this case is clearly excessive in view of the evidence presented. Our review of the record, informed by a review of awards granted in other comparable cases, indicates that the award should have been no *greater* than $50,000. We therefore remand the case for the district court to reconsider damages on this issue and enter an award not to exceed $50,000.

## VIII. Attorney's Fees

 Defendants challenge the district court's award of attorney's fees to Wulf's counsel. The district court awarded attorney's fees of $272,725.15 and expenses of $7,676.70. The district court did not hold an evidentiary hearing, despite defendants' request for such a hearing. Defendants assert on appeal that the district court erred in failing to hold a hearing, and they challenge numerous specific aspects of the district court's award. We reverse and remand for a hearing on the fees and expenses properly awardable to Wulf. We note that, in view of our holding that neither the City nor Denton is liable for Wulf's injuries, attorney's fees may only be assessed against LaMunyon.

As the Supreme Court has recently made clear, a party is entitled to attorney's fees as a prevailing party under 42 U.S.C. § 1988 when he "has succeeded on 'any significant issue in litigation which achieve[d] some of the benefit the parties sought in bringing suit.'" *Texas State Teachers Association v. Garland Independent School Dist.*, —— U.S. ——, 109 S.Ct. 1486, 1493, 103 L.Ed.2d 866 (1989) (quoting *Nadeau v. Helgemoe*, 581 F.2d 275, 278–79

(1st Cir.1978). Wulf meets that test and is thus entitled to attorney's fees. *See Starrett v. Wadley*, 876 F.2d 808. However, we remand for the district court to conduct an evidentiary hearing to determine the appropriate amount, given our partial reversal of Wulf's judgment on appeal. *See Mares v. Credit Bureau of Raton*, 801 F.2d 1197, 1205 n. 16 (10th Cir.1986) ("Normally we would expect the district court to hold a hearing."). We offer some specific guidance to the district court on remand.

■■ First, a multiplier for "exceptional results" is inappropriate in this case, particularly in view of our disposition of this case on appeal. *See Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565, 106 S.Ct. 3088, 3098, 92 L.Ed.2d 439 (1986) ("*Delaware I*") ("the 'novelty [and] complexity of the issues,' 'the special skill and experience of counsel,' the 'quality of representation,' and the 'results obtained' from the litigation are presumably fully reflected in the lodestar amount, and thus cannot serve as independent bases for increasing the basic fee award.") (quoting *Blum v. Stenson*, 465 U.S. 886, 898–900, 104 S.Ct. 1541, 1548–50, 79 L.Ed.2d 891 (1984)); *Hall v. Ochs*, 817 F.2d 920, 929 (1st Cir.1987).

■■ Furthermore, the district court failed to adequately support its conclusion that this is a case in which a real risk of loss justifies an enhancement of the lodestar amount. In *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 483 U.S. 711, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987) ("*Delaware II*"), the Supreme Court noted that:

> "if the trial court specifically finds that there was a real risk of not prevailing issue in the case, an upward adjustment of the lodestar may be made, but, as a

general rule, in an amount no more than ⅓ of the lodestar. Any additional adjustment would require the most exacting justification."

*Id*. 107 S.Ct. at 3089. While the district court stated that there was a real risk of loss in this case, such a conclusion is unsupported by specific findings. The other factors justifying a risk multiplier, as identified by the Supreme Court's plurality opinion in *Delaware II*, are not supported by adequate findings either. Thus, on remand, absent adequate findings, no risk multiplier would be appropriate.[44]

Defendants also challenge the hourly rate selected by the district court, arguing it is too high and is based on rates in national markets and in other types of litigation. They also challenge certain of the hours awarded to plaintiff's counsel, claiming that they reflect work not properly compensable. We direct the district court on remand to carefully calculate "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983). The court should review the appropriate standards for reaching that figure set forth in *Hensley*, and in our opinions in *Mares v. Credit Bureau of Raton*, 801 F.2d 1197 and *Ramos v. Lamm*, 713 F.2d 546 (10th Cir.1983).

## CONCLUSION

For the foregoing reasons we AFFIRM the district court's conclusion that Wulf's termination violated his First Amendment rights, and that LaMunyon is personally liable and lacks qualified immunity. We REVERSE (1) the district court's conclusion that Denton is personally liable and

---

**44.** For example, in *Delaware II*, a plurality of the Court stated that "no enhancement for risk is appropriate unless the applicant can establish that without an adjustment for risk the prevailing party 'would have faced substantial difficulty in finding counsel in the local or other relevant market.'" *Id*. at 3091 (O'Connor, J., concurring) (quoting plurality at 3089). The district court in this case concluded that "without risk-enhancement the plaintiff would have faced substantial difficulties in finding counsel." R.

Vol. IV at tab 139 (Opinion and Order, August 27, 1987 at 9). Its explanation for that conclusion was that "[t]he case was brought against one of the most established institutions in this metropolitan county: its police force. Few counsel would have undertaken the job of tackling the bureaucracy as did Focht and Lawing." *Id*. That explanation, without more specific findings, is an insufficient basis on which to award an enhancement for risk.

that the City is liable; (2) the conclusion that Wulf's liberty interest was violated when he was terminated; and (3) the award of punitive damages against LaMunyon. We REVERSE the award of $250,000 for emotional distress and direct the district court to recalculate the award and enter it in an amount not to exceed $50,000. We REMAND for a recalculation of the awards of front pay and back pay in light of our discussion of those awards. We REMAND for an evidentiary hearing on the attorney's fees due Wulf's counsel.